[No. C045429. Third Dist. June 29, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC LINELL SHELMIRE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through VII of the Discussion.

**COUNSEL**

Michael Satris, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stan Cross, Charles A. French and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SIMS, Acting P. J.**—In *People v. Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913] *(Sedeno)*, our Supreme Court said, "[T]he duty to give instructions . . . on particular defenses and their relevance to the charged offense arises only if it appears that a defendant is relying on such a defense, *or* if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." *(Id.* at p. 716, italics added.)

The first prong of this disjunctive test suggests that a defendant is entitled to an instruction on a defense on which defendant is "relying" even if no substantial evidence supports the instruction. In this case, we conclude that more recent Supreme Court authority has overruled the first prong of the *Sedeno* test. Put differently, we conclude that a defendant is entitled to an instruction on a defense only where substantial evidence supports the defense.

In a joint trial with three separate juries, defendant Eric Linell Shelmire was tried along with codefendants Andre Craver and Gerald Jones, Jr., for first degree murder (Pen. Code, § 187, subd. (a); undesignated section references are to the Penal Code), with the special circumstance allegations of

murder in the commission of an attempted robbery and in the course of a burglary (§ 190.2, subd. (a)(17)), and the additional allegation of being armed with a firearm (§ 12022, subd. (a)(1)).[1] Defendant's jury convicted him of first degree murder and found the firearm allegation true, but rejected the special circumstance allegations.

Defendant contends: (1) The trial court erred reversibly by failing to instruct the jury sua sponte on defendant's burden of proof as to his only theory of defense, withdrawal. (2) The trial court's instructions on the definition of withdrawal were prejudicially erroneous. (3) The trial court abused its discretion by granting the prosecution's request for separate juries over defense objection. (4) The trial court erred by denying defendant's motion for mistrial. (5) The trial court abused its discretion by denying the jury's request for a readback of defense counsel's closing argument. (6) The trial court erred by denying defendant's motion for new trial. (7) Cumulative prejudice requires reversal.

We shall affirm.

## FACTS

### The crimes

In September 2001, the murder victim, Justin Roberts, lived in an apartment in Carmichael along with his girlfriend Sally Lewis and their two small children, Lewis's brother Levi, and Roberts's friend Eric Aguiar.[2] Roberts and his family shared the master bedroom, Levi occupied the other bedroom, and Aguiar slept on the couch in the living room.

Roberts legally grew marijuana on his patio for medicinal purposes, and Lewis was his licensed caregiver. Roberts also sold marijuana to friends, however. Aguiar had a felony conviction for transporting marijuana.

Two or three weeks before the homicide, Gilbert Espinoza, Jr., went to Roberts's home to buy marijuana. According to Aguiar, Espinoza said his friend "Munchie" (codefendant Craver) wanted to make a purchase. Espinoza assured Aguiar that Craver was "cool."[3] Aguiar agreed to sell Craver a quarter-pound of marijuana for $1,100 as a favor to Espinoza.

---

[1] Craver and Jones were convicted of first degree murder and the firearm enhancement was found true as to both. As to Craver, the jury also found the burglary special circumstance true. They are not parties to this appeal.

[2] All dates mentioned are in 2001.

[3] Espinoza testified he did not tell Craver that Roberts had marijuana at the apartment. He denied giving Craver the code to the apartment complex gate, which Roberts had given him.

Aguiar later met Craver and exchanged the marijuana for cash, but Roberts discovered on inspection that the cash was counterfeit; Aguiar paid him to cover the loss. Aguiar conveyed his anger and his desire to recover the money to Espinoza, but Aguiar and Espinoza denied looking for Craver or putting out word on the street about him.

Around 4:00 a.m. on September 14, Aguiar, sleeping on the living room couch in the dark apartment, was suddenly awakened by the sound of the window blinds crashing, followed by someone jumping through the open window and landing on top of him. He could see only that the intruder was Black. The intruder hit him in the head with something metallic. Aguiar shoved his right index finger into the intruder's eye socket, causing him to scream twice, "I need help."

Lewis and Roberts, also now awake, ran to the living room, with Roberts ahead. Roberts flipped the light switch, temporarily blinding Lewis.

Three gunshots rang out. Aguiar saw the flashes and heard the shots near his head. He did not know whether his antagonist or a second intruder had fired the shots. Aguiar's antagonist then jumped out the window.

Lewis found Aguiar bleeding in the living room. Then she found Roberts lying in a pool of blood on the bathroom floor, dying of a gunshot wound to the chest.

Steven Palenko, who lived in an apartment in the next building, was woken by the gunshots. He tried to call 911, but misdialed in the dark. Hearing a woman scream that her husband had been shot, and looking out the window, Palenko saw three dark-skinned men running away. He observed the clothing worn by the one later identified as defendant. He saw the men jump over a fence, reach the gate of the next apartment complex, crouch behind the fence until a car drove past, then open the gate; two ran to the left and the other to the right. Palenko then succeeded in calling 911.

Sacramento County Deputy Sheriff John Sydow, dispatched to the scene, heard on the radio that suspects had been seen fleeing. He saw a Black male, later identified as defendant, running through a gas station. When Sydow stopped defendant, defendant gave a false last name. Sydow detained him, then brought him to a field identification showup, where Palenko identified him as one of the three men he had seen. Palenko also identified codefendant Craver in a later photo lineup as another of the men.

At the crime scene, officers found a .45-caliber shell casing on the floor, another shell casing on the couch, a shell casing on the side of the couch, and a bullet hole in the kitchen cabinet. Detective Grant Stomsvik determined that the gun had probably been fired close to the couch along the west wall. The officers also discovered evidence of a marijuana sales operation in the apartment.

DNA evidence showed that blood on the window blind and couch was Aguiar's and that material in fingernail scrapings taken from Aguiar's right index finger had come from Craver. Fingerprints on the living room window blinds were determined not to be defendant's.

*Defendant's statements*

*September 14*

Interviewed by Detective Will Bayles, defendant first claimed he had been at a party in the neighborhood and had then been out looking for a pay phone to call his brother-in-law for a ride. His girlfriend, Kimberly Domondon, came to the police station and talked to him while the officers surreptitiously recorded the conversation; he told her the same story.

Bayles eventually confronted defendant and told him to tell the truth. Defendant denied doing anything wrong or knowing anything about what had happened inside the apartment.

Ultimately, defendant said Craver had knocked on his door around 2:30 a.m. and asked him to come along to get money and marijuana from Craver's brother; Craver promised to repay a loan from defendant. Craver drove them to the North Highlands area, where he talked to a man defendant did not know. Craver and the other man, driving separate vehicles, parked in front of an apartment complex; the other two walked in, Craver saying he would be back in five or 10 minutes. After a while, defendant got out of Craver's car and went to look for the others. Unable to open the gate to the complex, defendant jumped a fence. As he walked toward the rear of the complex, he heard gunshots and screams. Defendant ran off and went through a creek; he did not know if the others had come the same way.

Defendant frequently expressed fear of Craver, asking if he would come into contact with him in jail and worrying about whether Craver would be able to see the written report of this interview.

*September 15*

Interviewed by Detectives Bayles and Stomsvik, defendant admitted he had made up his original story. During a conversation with defendant's brother and sister-in-law that the officers surreptitiously monitored, defendant told them the story he had finally told Detective Bayles the day before, adding that Craver had set him up and had fired the shots.

Defendant then told the detectives that 90 percent of what he had said the day before was the truth. He now said that after the three men arrived at the apartment complex, the other two whispered to each other, then fell silent when he got out of the car and walked up to them. He got back into Craver's car. Craver came over and said he would be right back. Defendant saw the other two walk through the gate, indicating that Craver knew the code. Defendant waited five or 10 minutes, then hopped over the gate and headed toward an open window, assuming the others had gone in there. Because the blinds were closed, he could not see into the apartment. He heard tussling, someone who sounded like Craver saying "motherfucker," and two or three gunshots. He ran away alone, going too fast for the others to catch up. He had not known a robbery was planned, he had not seen that anyone had a gun, and he had believed they were going to Craver's brother's place.

*September 19*

In a recorded statement that the jury heard in part, defendant repeated the story he had told on September 15.

*September 20*

In a recorded statement that the jury also heard in part, defendant told a somewhat different story.

Contrary to his previous story, he had not loaned Craver money. Craver unexpectedly showed up at defendant's home around 6:00 p.m. on September 14, carrying a duffel bag that contained nunchakus, small knives, photo albums of Craver's family, and a purported "death manual" about ways to hurt people. Defendant did not know why Craver was showing him these items. Hoping Craver would leave, defendant said he was going out.

Craver then talked about the residence of a couple of marijuana dealers whom he had burned with fake money. He thought it would be easy to burglarize the place, netting a couple of thousand dollars and a couple of pounds of marijuana. He told defendant where the money and marijuana would probably be and said the two of them would just "grab the shit and get out." Defendant verbally consented.

Defendant heard a knock at the door around 2:00 or 3:00 a.m., but did not answer immediately, hoping Craver would go away. When he eventually answered the door, Craver surprised him by saying they would get a third person because there were a lot of people in the target apartment.

At the apartment complex, all three men walked up to the gate; Craver opened it, using the code, and pointed out the target apartment. He kept his hands hidden in the front pocket of his hooded sweatshirt. The other man carried a duffel bag.

Walking toward the apartment, defendant saw a window cracked open. He got scared and did not go near the window. Craver slid it open with gloved hands and entered, followed by the third man. Defendant thought the others knew he was scared, but did not tell the detectives that the others verbally challenged him or urged him on. He was not acting as a lookout.

Staying 20 feet from the window, defendant heard struggling, the word "motherfucker" from Craver, and gunshots; Craver immediately fled through the window and landed on the ground. Defendant asked him, "What the fuck you do?" and wanted to know if he had hit someone; Craver said he did not know. "[T]ripping the fuck out," defendant yelled Craver's nickname until Craver told him to shut up. They ran together and jumped a fence, then split up.

Defendant said he did not consider wearing a disguise or mask when they went to the apartment because he knew he was going to back out. He told the detectives he "stayed back to let them get everything under control," but then denied that that was the plan: "We really didn't talk about it. We just went in there without a plan or nothing."

Defendant wondered whether Craver had gone there intending to kill someone. Craver had told him there was a $5,000 hit out on him for burning Roberts on the marijuana purchase, but defendant had not believed it.

Defendant would not have gone to the apartment if Craver had told him he planned to kill anyone.

### Kimberly Domondon's statement

The detectives interviewed Domondon, who had been defendant's girlfriend for a month or two, on September 14 after defendant's arrest, and on several additional dates. At trial, she claimed she could not remember what she had said; she admitted that Craver had threatened her. However, according to one of the detectives, she told them the following:

Craver was at her home on September 14, wondering where defendant was; she told him she had thought defendant was with him. Craver concluded defendant must have gotten caught after taking a wrong turn. About a week later, Craver said he felt like killing defendant because "people don't know how to keep their mouths shut"; then he left, saying, "I think I have scared you enough." Craver also told her she should forget about defendant because he was "going to go down for this," while Craver had an ironclad alibi and had disposed of the gun.

### Other evidence

Searching Craver's residence, the detectives found torn pieces of paper on which were written the codes to the apartment complex gate and the number of Roberts's apartment.

### Defendant's case

Defendant did not testify or put on any evidence.

### Closing arguments

Defense counsel argued that defendant had withdrawn from participation in the crimes by failing to accompany the other defendants into the apartment, and he could not reasonably have been expected to do more to prevent the crimes because he was extremely afraid of Craver. The prosecutor replied that defendant had not done the minimum needed to show withdrawal because he had neither told the other defendants he was withdrawing nor taken any steps to prevent the crimes, and his alleged fear of Craver did not legally excuse him from doing these things.

## DISCUSSION

### I

Defendant contends the trial court erred prejudicially by failing to perform its duty to instruct the jury sua sponte as to defendant's burden of proof on his withdrawal defense. The People contend defendant was not entitled to an instruction on the withdrawal defense, so any error as to defendant's burden of proof on that defense is necessarily harmless. For reasons we shall explain, we agree with the People.

#### Background

The trial court instructed the jury on the defense of withdrawal with CALJIC No. 3.03 as follows: "Before the commission of the crimes charged an aider and abett[o]r may withdraw from participation in those crimes and thus avoid responsibility of [sic] those crimes by doing two things: First, he must notify the other principals known to him of his intention to withdraw from the commission of those crimes. Second, he must do everything in his power to prevent its [sic] commission." However, the court did not instruct the jury on defendant's burden of proof as to that defense.

On August 18, 2003, juries hearing the cases of codefendants Craver and Jones convicted them. However, defendant's jury continued deliberations as to him. During these deliberations, the jury asked for a readback of defense counsel's arguments about "communication of intention to withdraw." The jury also asked the trial court to clarify the legal meaning of the word "notify" and the phrase "everything in his power" as used in CALJIC No. 3.03. In addition, the jury requested the videotape and transcript of defendant's final interview with Detective Bayles.

The trial court provided the videotape and transcript, but denied the request for a readback of counsel's argument, saying: "A jury is not allowed to hear read-back [sic] of arguments by the attorneys on either side because attorneys' arguments are not evidence."[4] As to CALJIC No. 3.03, the trial court

---

[4] If the trial court meant that it was legally barred from providing a readback of counsel's argument, the court erred. Although not required to do so, the trial court has discretion under section 1138 to provide a readback of counsel's arguments. (*People v. Sims* (1993) 5 Cal.4th 405, 453 [20 Cal.Rptr.2d 537, 853 P.2d 992]; see *People v. Gurule* (2002) 28 Cal.4th 557, 649 [123 Cal.Rptr.2d 345, 51 P.3d 224]; *People v. Pride* (1992) 3 Cal.4th 195, 266 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

gave a clarifying instruction.[5] However, the court still did not instruct on defendant's burden of proof as to withdrawal.

The jury had deliberated for over eight hours up to that point. Soon after receiving the clarifying instruction, it returned its verdict.

*Analysis*

■ "The court on all proper occasions shall instruct the jury as to which party bears the burden of proof on each issue and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt." (Evid. Code, § 502.) A trial court has a sua sponte duty under Evidence Code section 502 to instruct the jury correctly on defendant's burden of proof as to a defense. (*People v. Mower* (2002) 28 Cal.4th 457, 483–485 [122 Cal.Rptr.2d 326, 49 P.3d 1067].)

■ However, the trial court is required to instruct on a defense (and, by extension, on the defendant's burden of proof as to that defense) only if substantial evidence supports the defense. (See *People v. Panah* (2005) 35 Cal.4th 395, 484 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Flannel* (1979) 25 Cal.3d 668, 684–685 [160 Cal.Rptr. 84, 603 P.2d 1] [limited on unrelated grounds by statute as described in *In re Christian S.* (1994) 7

---

[5] The instruction stated: "The word[] 'notify' and the phrase, 'everything in his power,' should be understood in their common, everyday sense. 'Notify' means to communicate or make known. [¶] 'Everything in his power' means to take some action that he is physically capable of taking. [¶] In the context of, 'withdrawal from participation of [*sic*] a crime,' those words mean that a defendant's failure to continue previously active participation in the crime planned is not enough to constitute withdrawal. [¶] There must be an affirmative and good faith rejection or repudiation of the plan communicated to the defendant's accomplices. [¶] In addition, the defendant must perform whatever action is available under the circumstances to prevent commission of the planned crime. [¶] Stated another way, the responsibility of a defendant who has knowingly and intentionally aided and abetted the commission of a crime does not cease unless, within time to prevent commission of the planned crime, he has done everything feasible to prevent its completion. [¶] If he changes his mind, he must do everything possible to prevent the crime from being committed. It is not enough that he may have changed his mind and tries, when too late, to avoid responsibility. [¶] He will be liable if he fails, within time, to let his accomplice know of his withdrawal and does not do everything in his power to prevent commission of the crime." Defense counsel objected to this instruction. Counsel argued that the phrase "physically capable of doing," standing alone, misstates the test because it does not limit "physically capable" to that "which is feasible under the circumstances[.]" Counsel asserted further that the remainder of the court's instruction set the bar too high for one withdrawing as an aider and abettor, as distinct from one withdrawing from a conspiracy.

Defendant renews this objection as a separate claim of error. (See part II of the unpublished portion of the Discussion.)

Cal.4th 768, 777–778 [30 Cal.Rptr.2d 33, 872 P.2d 574]]; *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1243 [7 Cal.Rptr.3d 401]; *People v. Miceli* (2002) 104 Cal.App.4th 256, 267 [127 Cal.Rptr.2d 888].) Substantial evidence is "evidence which is reasonable, credible, and of solid value[.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; accord, *People v. Horning* (2004) 34 Cal.4th 871, 901 [22 Cal.Rptr.3d 305, 102 P.3d 228].) On review, we determine independently whether substantial evidence to support a defense existed. (See *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270 [62 Cal.Rptr.2d 345]; *People v. De Leon* (1992) 10 Cal.App.4th 815, 824 [12 Cal.Rptr.2d 825] (maj. opn. of Woods, J.); *id.*, at pp. 824–825 (conc. opn. of Johnson, J.).)

■ To be entitled to an instruction on the withdrawal defense, a defendant charged with aiding and abetting a crime must produce substantial evidence showing that (1) he notified the other principals known to him of his intention to withdraw from the commission of the intended crime or crimes, and (2) he did everything in his power to prevent the crime or crimes from being committed. (See *People v. Ross* (1979) 92 Cal.App.3d 391, 405 [154 Cal.Rptr. 783]; *People v. Norton* (1958) 161 Cal.App.2d 399, 403 [327 P.2d 87].) As noted, the trial court so instructed the jury.

■ We conclude defendant was, not entitled to an instruction on this defense because substantial evidence did not support it. According to the evidence most favorable to defendant, his last interview with the police, he neither communicated to codefendants that he was withdrawing from participation in the crime nor did anything to prevent it: he merely hung back while they went into the apartment, waited until they reemerged, and fled along with them. Although trial counsel argued that defendant's failure to go in with the others communicated his intent to withdraw, the jury heard no objective evidence that they so understood his conduct. And there is no evidence whatever that he tried to prevent the crimes from occurring.

Defendant asserts he "held back while Craver and Jones conspired." So far as this assertion is meant to support defendant's theory of withdrawal, it fails to do so because we cannot find any evidence in the record that codefendants "conspired" at the crime scene. On the contrary, defendant told the detective that the principals "really didn't talk about it. We just went in there without a plan or nothing."

Defendant asserts he told the police "he thought Jones and Craver knew he had gotten cold feet and was backing out." But what defendant claims to have "thought" is irrelevant. The withdrawal test is objective. Its first prong is the

actual communication of one's intent to withdraw. If defendant did not tell Jones and Craver that he was backing out, we do not see how they could have known it. Even if they noticed (despite the darkness inside the apartment, the immediate struggle, and the speed at which events moved) that he had not gone into the apartment along with them, they might still have thought he would come in after them.

But even if defendant's failure to go into the apartment could have been deemed substantial evidence that he communicated his intent to withdraw, defendant points to no evidence that he did anything to prevent the crimes from occurring. For this reason alone, he was not entitled to an instruction on withdrawal.

Defendant renews his argument at trial that he should not have to show any effort to prevent the crimes from occurring because he actually and reasonably feared for his life at the hands of codefendant Craver if he had done anything more than he did while the crimes were in progress. He asserts, in other words, that we must assess this issue by engrafting the notion of duress onto the withdrawal defense. Although defendant does not cite any California authority on point for this proposition, we shall assume for the sake of argument that a withdrawal defense may be available to a defendant who does not attempt to stop an ongoing crime in which he initially agreed to participate because he reasonably fears that any such attempt would endanger his life at the hands of a coprincipal. Nevertheless, the facts do not support defendant's claim that he was entitled to that defense.

■ Under California law, duress is a defense to any noncapital crime where the defendant acted "under threats or menaces sufficient to show that [he] had reasonable cause to and did believe [his] li[fe] would be endangered if [he] refused." (§ 26, subd. Six.) We see no rationale for applying any other definition of duress here. Therefore we must determine whether a reasonable person in defendant's position would have believed his life would be endangered if he refused to continue his participation in the crimes or if he attempted to prevent their commission, and whether defendant actually so believed. We conclude that defendant cannot meet either of these tests.

Relying on his last statement to the police, defendant claims that he was "intimidated" by Craver on the evening of the crime because Craver brought a duffel bag containing weapons and a "death manual" about ways to hurt people, and also photographs of himself in prison; defendant wanted him to leave. However, defendant did not say he was intimidated by Craver (using

that word or any other). Indeed, defendant said he did not know why Craver was showing him the items in the duffel bag. The photographs appear to have been of Craver's family, not of Craver in prison.[6] And although defendant did say he wanted Craver to leave, he did not say that it was out of fear.

Defendant asserts that when Craver returned later in the evening after having outlined the proposed robbery to him, he did not initially open the door and waited a long time before doing so. Again, however, he did not say that this was out of fear.

Defendant asserts he "became even more wary and reluctant when he realized the enterprise was becoming more serious after Craver revealed the involvement of a third person." However, in the passages defendant cites, he merely described the unfolding events. He never said at that point in the interview that he was becoming fearful or uneasy.

Defendant asserts he told the police "he had decided to back out on the way to the apartment and he became increasingly fearful when he trailed Jones and Craver as they walked to the apartment and entered it." So far as defendant means that he was fearful *of Craver*, the record does not support him. He said that at the point when they got to the complex he was "watching out for [him]self," then, "I guess they kind of knew I was like scared. I don't know. I guess they really wasn't—shit, [Craver] wasn't worried about it. (Unintelligible) afraid to go inside." When the detective asked: "You're in a place you really didn't want to be, weren't you? [¶] . . . [¶] Kind of got yourself in over your head. Is that right?" defendant said, "Yeah." In short, what defendant claimed to fear was not his coparticipants but following through with the crime itself.

Similarly, as noted above, defendant told the police "he thought Jones and Craver knew he had gotten cold feet and was backing out." This statement reinforces the point we have just made. If defendant, believing Craver "knew" that, did not go ahead to assist in committing the crime, it follows that he was more afraid of going through with his part in the crime than of any retaliation from Craver for withdrawing from it. It is illogical on these facts to assert that fear of Craver prevented defendant from taking all the steps required by the withdrawal defense.

---

[6] Defendant said: "He brought over nunchakas [*sic*]. He had knives. That fucker is crazy, man." However, the context does not show that this meant defendant was claiming to be intimidated by him. Defendant also said ambiguously: "I looked through his pictures, you know what I'm saying, his family and all that, him being in the pen and all that." But later on he agreed with the detective that the pictures were of Craver's family.

Just as there is no substantial evidence defendant actually believed his life would be in danger from Craver if he withdrew from participation in the crime, there is no substantial evidence that a reasonable person in defendant's position would have held that belief. Defendant fails to cite any evidence that Craver actually threatened or menaced him at any time before the crimes were committed. Thus, nothing in the record excuses defendant's failure to try to prevent the commission of the crime even on the theory that duress can form part of a withdrawal defense.

Finally, defendant contends he was entitled to an instruction on the defense, even if substantial evidence did not support it, because he was relying on the defense. He cites the disjunctive test set out in *Sedeno, supra,* 10 Cal.3d 703 (disapproved on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 149, & 178, fn. 26 [77 Cal.Rptr.2d 870, 960 P.2d 1094]), which we have mentioned: "[T]he duty to give instructions . . . on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, *or* if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*Sedeno, supra,* 10 Cal.3d at p. 716, italics added; accord, *People v. Breverman, supra,* 19 Cal.4th at p. 157.) However, neither in *Sedeno* nor in any later case has the high court used the first prong of the *Sedeno* test to require instruction on a defense for which there was no substantial evidence. (Cf. *People v. San Nicolas* (2004) 34 Cal.4th 614, 669 [21 Cal.Rptr.3d 612, 101 P.3d 509]; *People v. Maury* (2003) 30 Cal.4th 342, 424 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Michaels* (2002) 28 Cal.4th 486, 529 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Barton* (1995) 12 Cal.4th 186, 194–195 [47 Cal.Rptr.2d 569, 906 P.2d 531]; *People v. Johnson* (1993) 6 Cal.4th 1, 43–45 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1026 [248 Cal.Rptr. 568, 755 P.2d 1017] [citing test erroneously as conjunctive]; *People v. Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311], disapproved on another point in *People v. Barton, supra,* 12 Cal.4th at p. 201.)

Moreover, our Supreme Court has disapproved *Sedeno* to the extent it suggested a duty to instruct " 'whenever any evidence is presented, no matter how weak.' " (*People v. Flood* (1998) 18 Cal.4th 470, 480 [76 Cal.Rptr.2d 180, 957 P.2d 869] (italics omitted); see *People v. Flannel, supra,* 25 Cal.3d at p. 684, fn. 12.) Accordingly, most recent decisions of our Supreme Court have not mentioned the first prong of the *Sedeno* test and have said, "A trial court is required to give a requested instruction on a defense only if substantial evidence supports the defense. [Citation.]" (*People v. Panah, supra,* 35 Cal.4th at p. 484; see *In re Christian S., supra,* 7 Cal.4th at p. 783, but see *People v. San Nicolas, supra,* 34 Cal.4th at p. 669.)

We conclude that these recent decisions, including *People v. Flood, supra,* 18 Cal.4th at page 480, have overruled the first prong of the *Sedeno* test. ."It is an established rule of law that a later decision overrules prior decisions which conflict with it, whether such prior decisions are mentioned and commented upon or not." (*In re Lane* (1962) 58 Cal.2d 99, 105 [22 Cal.Rptr. 857, 372 P.2d 897].)

Furthermore, we have no hesitation in departing from the first prong of the *Sedeno* test, which has been overruled in later cases, because it is illogical. The Legislature or the courts create defenses in order to specify circumstances or states of mind that excuse conduct that is otherwise criminal. But the People, as well as defendant, have the right to an accurate enforcement and interpretation of the law. (See *People v. Birks* (1998) 19 Cal.4th 108, 127–128 [77 Cal.Rptr.2d 848, 960 P.2d 1073]; *People v. Barton, supra,* 12 Cal.4th at p. 201.) It defeats the policy judgments of the courts and the Legislature to allow a defendant to receive an instruction on a defense, and to allow a jury to excuse criminal conduct, when the defendant purports to rely on a defense for which substantial evidence does not exist. Dangerous persons could go free. Moreover, such an instruction will often confuse a jury because the jury will probably wonder why it has received an instruction on a defense for which there is no substantial evidence. For all these reasons, absent substantial evidence to support his withdrawal defense, defendant was not entitled to instruction on that defense merely because he purported to rely on it.

We have no doubt that a defendant's story (his version of the events in question) constitutes substantial evidence, in and of itself, even if the story is implausible and seriously contradicted by other evidence. However, as we have explained, defendant did not testify, and his pretrial statements did not make out the essential elements of a withdrawal defense.

Because defendant was not entitled to an instruction on a withdrawal defense, any error in the trial court's failure to instruct on defendant's burden ·of proof on that defense is necessarily harmless by any standard.

II–VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, ante, page 1044.

## DISPOSITION

The judgment is affirmed.

Davis, J., and Raye, J., concurred.

A petition for a rehearing was denied July 20, 2005, and appellant's petition for review by the Supreme Court was denied October 19, 2005. Kennard, J., did not participate therein.