Filed 4/15/16  P. v. Ramon CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER ANDREW RAMON,<br><br>    Defendant and Appellant. | F069550<br><br>(Super. Ct. No. BF150575A)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Paul V. Carroll, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Gomes, Acting P.J., Detjen, J. and Peña, J.

On April 30, 2014, a jury convicted appellant Christopher Andrew Ramon of rape of a person unconscious of the nature of the act (Pen. Code, § 261, subd. (a)(4)). On June 4, 2014, the court sentenced Ramon to prison for the middle term of six years.

On appeal, Ramon contends: (1) the court committed instructional error; and (2) he was denied the effective assistance of counsel. We affirm.

## FACTS

*The Trial Evidence*

R.S. testified that in August 2013, she shared a bedroom with her boyfriend Matthew M. in a house with two other roommates. She was acquainted with Ramon through Matthew M. R.S. never had a romantic relationship with Ramon.

On August 31, 2013, sometime before 1:00 a.m., Matthew M. called Ramon and they decided to "hang out."[1] R.S. drove Matthew M. to pick up Ramon and on the way back, they stopped and bought a bottle of vodka. The trio then went outside, listened to music, and began drinking. However, R.S. became sick and at approximately 2:00 a.m., she went to bed in her room. R.S. took a generic version of a Tylenol PM pill. Ramon and Matthew M. remained outside.

R.S. testified that at 4:00 a.m., she awoke to heavy breathing and somebody having sexual intercourse with her. When she first woke up, she thought her boyfriend Matthew M. was on top of her and she said his name. When there was no response, she realized Ramon was on top of her. R.S. said Ramon's name and he replied, "Yes." She nudged his face and he immediately got off her. Fifteen to 20 seconds passed from the time she woke up and realized someone was having intercourse with her until she realized it was Ramon. She did not know how long he had been having sex with her because she was asleep. R.S.'s roommate called the Sheriff's Department.

---

[1] Ramon had spent the night at the home of R.S. and Matthew M. at least 30 times before, and had always stayed inside their home.

2

During cross-examination, R.S. testified that she spoke to Kern County Sheriff's Deputy Ryan Wahl about the incident with Ramon. R.S. told Deputy Wahl that when she awoke she was hugging the person on top of her, and that she wrapped her arms around him as she was waking up, because she thought he was her boyfriend Matthew M. A little later, she explained that Ramon was having intercourse with her before she put her arms around him, and that as she was waking up, thinking the person on top of her was Matthew M., she put her arms around him and said Matthew M.'s name. R.S. also acknowledged telling Deputy Wahl that Ramon had intercourse with her no longer than five minutes after she awoke. However, she was adamant that only 15 to 20 seconds elapsed between the time she woke up and when Ramon got off of her.

Deputy Wahl testified that he responded to R.S.'s house at 6:24 a.m. At 7:20 a.m., after interviewing R.S., Wahl had R.S. make a "pretext" call to Ramon that was recorded. During the call, R.S. asked Ramon if she gave him permission to have sex with her, and Ramon replied that she had not. When she asked him why he did "it," Ramon replied, "Because I was [expletive] drunk and horny …. What do you expect?" When R.S. told him that she was sleeping and did not know what was going on until she woke up, Ramon replied, "*I know*." (Italics added.)

Later in the conversation, the following colloquy occurred:

"[R.S.]: You raped me Chris. I was in bed sleeping, and you forced yourself on top of me and inside of me. You raped me.

"[RAMON]: I raped you?

"[R.S.]: Yes you did. What would you call that?

"[RAMON]: I guess rape. …"

Still later in the conversation, the following colloquy occurred:

"[R.S.]: *You knew I was asleep Chris. You knew I was passed out in my own bed.* Chris you knew I would never give you permission to even

lay next to me in my bed or have sexual intercourse with me. You know that. (Italics added.)

> "[RAMON]:  *Yeah*. (Italics added.)

> "[R.S.]:  You know I would never even give you permission to touch me like that. Why did you do it Chris?

> "[RAMON]:  I guess because I was drunk. You know I'd never do that sober. You think I would do that sober, [expletive] no.  …"

The prosecution also introduced into evidence a copy of a recording of a postarrest interview of Ramon by Deputy Wahl. During the interview, Ramon admitted that R.S. was asleep when he began having sex with her, that he had sex with her for less than two minutes before she woke up, and that he knew it was wrong to have sex with her while she was unconscious.

*Jury Instructions*

During discussions on jury instructions, the court asked defense counsel if it should charge the jury with CALCRIM No. 3406, and he replied that he thought that it "need[ed]" to be given. When the court stated that it was not persuaded that it was appropriate to charge the jury with this instruction, defense counsel argued that the victim's actions in putting her arms around Ramon could have led him to believe she was conscious and aware of what was going on. The prosecutor agreed that CALCRIM No. 3604 should be given "out of an abundance of caution." After further discussion, the court agreed to charge the jury with CALCRIM No. 3406 and the court stated:

> "I propose to phrase that if you find that the defendant believed that the alleged victim was conscious of the nature of the act and if you find that the belief was reasonable, he did not have the specific intent or mental state required for the crimes charged in counts one or two."[2]

---

[2]  Count 1 of the information charged Ramon with rape of an unconscious person; count 2 charged him with first degree burglary.

4

The court asked the prosecutor and defense counsel if they had "[a]ny disagreement with the phrasing," and they both responded that they did not.

During jury instructions, the court charged the jury with the language of CALCRIM No. 3406 as follows:

"The defendant is not guilty of counts one [rape of an unconscious person] or two [first degree burglary] if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact. If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit the crimes charged in counts one or two.

"If you find that the defendant believed that the alleged victim was conscious of the nature of the act and if you find that that belief was reasonable, he did not have the specific intent or mental state required for the crimes charged in counts one or two.

"If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for either of the crimes charged in counts one or two, you must find him not guilty of those crimes."

## DISCUSSION

Ramon contends the rape of an unconscious person requires the perpetrator to have a specific mental state, i.e., the perpetrator must know the victim was unconscious. He further contends that because there is no legal requirement that the perpetrator's mental state be reasonable, the court erred when it instructed the jury that his mistake of fact, i.e., his belief that she was conscious when he had intercourse with the victim, had to be reasonable. (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115). Alternatively, he contends his defense counsel provided ineffective representation by counsel's failure to object to "an erroneous instruction that grafted a reasonableness requirement onto Ramon's actual mental state." Respondent contends Ramon forfeited his challenge to CALCRIM No. 3406, because defense counsel assented to the phrasing of the instruction. We agree with respondent.

5

Ramon expressly agreed through defense counsel to the language used by the court in charging the jury with CALCRIM No. 3406. By doing so, Ramon forfeited his claim that the court erred when it instructed the jury that his mistake of fact had to be reasonable. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1223.)

However, even if this claim were not forfeited and the issue properly before us, we would reject it as harmless error.

> "Generally, a crime is not committed 'unless there is a union of act and either wrongful intent *or* criminal negligence. [Citations.]' [Citation.] … [S]ection 26 lists classes of persons deemed incapable of committing crimes, including '[p]ersons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.' [Citation.]

> "A mistake of fact defense 'requires, at a minimum, an actual belief "in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act...."' [Citations.] Moreover, for 'general intent crimes' the mistaken belief must be 'both actual and reasonable,' *while specific intent crimes or crimes involving knowledge require only an actual mistaken belief.*" (*People v. Givan* (2015) 233 Cal.App.4th 335, 343, italics added.)

> "A defendant may be convicted of rape of an unconscious person only if he had both knowledge of the person's unconsciousness and the wrongful intent to engage in an act of sexual intercourse with an unconscious person." (*People v. Dancy* (2002) 102 Cal.App.4th 21, 37.)

> "[Moreover,] [a] trial court [must] instruct on a defense [of mistake of fact defense] … only if substantial evidence supports the defense." (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1054.)

The evidence overwhelmingly established that R.S. was unconscious when Ramon began having intercourse with her. R.S. testified that she awoke when someone was already on top of her, breathing heavy and *having intercourse with her*. Thinking it was her boyfriend Matthew M., R.S. put her arms around his shoulders and called out Matthew M.'s name. However, when she realized it was Ramon, she pushed his face away. R.S. further testified 15 to 20 seconds passed between the time she awoke and

6

realized someone was having intercourse with her and the time she realized it was Ramon. During R.S.'s call to Ramon after the rape, Ramon admitted that he was aware she was asleep when he was having intercourse with her. Ramon never claimed that he thought she was awake at any time while he had intercourse with her. During the interview with Deputy Wahl, Ramon admitted he knew R.S. was asleep when he began having intercourse with her, and that he continued to have sex with her for "less than two minutes" before she woke up. At no time during the interview did Ramon contend that he believed R.S. was awake prior to him beginning to have intercourse with her.

We conclude the record does not contain any evidence from which it can be inferred that prior to engaging in intercourse with R.S., Ramon actually believed, whether reasonably or not, that R.S. was conscious when he began having intercourse with her. Thus, there was no factual support in the record for the court to charge the jury with CALCRIM No. 3406.

Ramon contends R.S. may have acted in a manner that led him to conclude she was "conscious and willing" if she had intercourse with him for up to five minutes, and because she testified that she must have placed her arms around Ramon and hugged him while she was unconscious. Defense counsel cites Ramon's conduct in immediately getting off of R.S. as soon as she nudged him as evidence of "his belief" that R.S. was conscious and willing.

Ramon's contention is based on pure speculation because, as noted earlier, the record does not contain any evidence Ramon actually believed R.S. was conscious prior to having intercourse with her. It is also based on an erroneous factual premise because R.S. testified she placed her arms around Ramon as she was waking up, and at that point Ramon had already been having intercourse with her. R.S.'s testimony was uncontradicted. Therefore, since the record does not contain any evidence Ramon actually believed R.S. was conscious when he sexually assaulted her, any error in charging the jury with CALCRIM No. 3406 was harmless. Under the circumstances,

charging the jury with an instruction not supported by the evidence inured to Ramon's benefit because it provided a means—to which he was not entitled—by which the jury could have acquitted him of the rape charge. Consequently, Ramon was not prejudiced by the instruction.

There is also no merit to Ramon's ineffective assistance of counsel claim. "To prevail on such claims, he must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." … "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.) We need not decide whether counsel was deficient or brilliant by convincing the court to give a favorable yet unsupported instruction. As discussed earlier, the evidence of Ramon's guilt on the rape charge was overwhelming. R.S.'s testimony that Ramon raped her while she was unconscious was uncontradicted based on: (1) Ramon's admission during the pretext call that he knew R.S. was asleep when he had intercourse with her; (2) Ramon's same admission during the interview with Deputy Wahl; and (3) Ramon's failure during both the call and the interview to deny that he raped her while she was asleep. Accordingly, we reject Ramon's ineffectiveness assistance of counsel claim because he cannot establish prejudice.

**DISPOSITION**

The judgment is affirmed.