Filed 9/9/24  P. v. Ponciano CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ROBERTO CARLOS PONCIANO, <br><br> Defendant and Appellant. | D082991 <br><br><br> (Super. Ct. No. FSB20002540) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Alexander R. Martinez, Judge.  Affirmed.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Roberto Carlos Ponciano guilty of second-degree murder as to victim Ruben Colunga (Pen. Code,[1] § 187, subd. (a)) and attempted murder as to victim Gary M. (§§ 664, subd. (a) & 187, subd. (a)).  Defendant contends on appeal that the trial court prejudicially erred by: (1) instructing the jury on a "kill zone" theory of attempted murder liability because the evidence did not support the theory that Colunga was the primary target; and (2) giving a kill zone instruction that was an incorrect statement of law.

We conclude there was sufficient evidence to support the kill zone theory with Colunga as the primary target, and that the instruction correctly stated the law.  Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Trial Evidence*

In July 2020, Mario S. and his partner hosted a fundraising party in their backyard to help cover a friend's funeral expenses.  Late in the evening, defendant's older brother Francisco Ponciano, who had consumed about 10 alcoholic drinks at the gathering, was kicked out of the party for engaging in sexual acts with a woman in front of other guests and children.  Francisco and the woman returned shortly thereafter to retrieve the woman's purse, but some party guests stopped them from going into the yard.  Francisco testified at trial that some of those guests also attacked them and blocked his car from leaving.  He said he was punched a few times through his open driver's side window by two people.  Gary M., who was in front of the house during the altercation, told detectives that Colunga may have been one of the people who punched Francisco.  Witnesses testified that sometime after Francisco left the party, he sped by the house in his car several times.

---

[1]     Further undesignated statutory references are to the Penal Code.

Cell phone logs and location data admitted at trial showed that Francisco exchanged several calls with his younger brothers—defendant and Oscar Ponciano—between 11:30 p.m. and midnight. At 11:37 p.m., Oscar texted his girlfriend, "Damn dude, my bro just called me [right now] he got fucked up." A minute later he texted her, "Shit's about to go down."

At 11:45 p.m., defendant texted Oscar, "Let's go." A minute later, he texted Oscar again, saying "He said the foo is still there[]" and "Letta go." Oscar texted back, "You can't get a heat?" A detective testified that "heat" commonly refers to a firearm or gun. Soon after, defendant drove with Oscar to the street where the party was happening in defendant's Dodge Ram 1500 truck. Witnesses said that when the truck arrived, it also sped up and down the street, revving its engine.

Around 11:55 p.m., Francisco called a co-worker and talked about going to do "something stupid." Surveillance video showed that around 12:00 a.m., Francisco's car pulled up to defendant's truck at an intersection near the party, with the vehicles' driver's side windows facing towards each other. Francisco and defendant spoke briefly, then parted ways. Defendant drove his truck down the street a short distance before turning around and coming back to drive past a group of men, which included Gary M., Colunga, and Mario S. At about 12:01:16 a.m., Mario S. threw a beer bottle at defendant's truck as it drove by.

Although at trial Oscar denied that defendant was angry that night, Oscar told detectives during an interview that the fact that someone threw something at the truck likely "set [defendant] off" because he "likes his truck a lot[.]" Oscar also told detectives that defendant said something like "fuck these fools" as he turned his truck toward Gary M. and Colunga and plowed into them. After hitting Gary M. and Colunga, the truck rammed into the

3

edge of a brick retaining wall with enough force to break it into pieces. Gary M. survived and suffered a broken leg and nerve damage. Colunga died from multiple blunt force injuries.

Surveillance video shows that about three seconds before impact, Gary M. held his arms out from his body and lifted his hands toward the truck as if to shoot. There was no evidence that Gary M. was armed, but he told detectives he pretended to point a gun at the truck when it came towards him to deter the driver. Oscar said he saw someone pointing a gun at them, and when he alerted defendant, they both ducked right before impact.

### B. Kill Zone Jury Instruction

The People charged defendant with Colunga's murder. (§ 187, subd. (a).) As to Gary M., the People charged defendant with premeditated attempted murder, with an enhancement for personally inflicting great bodily injury. (§§ 187, subd. (a), 664, 12022.7, subd. (a).) When the parties discussed jury instructions with the court, the trial judge said he intended to include bracketed language addressing the kill zone theory in the jury instruction on attempted murder (CALCRIM No. 600). The prosecutor agreed the language should be included. Defense counsel said he did not "think the kill zone [jury instruction] [was] appropriate," but otherwise submitted without further argument.

Before closing arguments, the court instructed the jury on attempted murder and included the following language:

> "A person may intend to kill a primary target and also a secondary target within a zone of fatal harm or 'kill zone.' A 'kill zone' is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.
>
> "In order to convict the defendant of the attempted murder of [Gary M.], the People must prove that the defendant not

4

only intended to kill Ruben Colunga, but also either intended to kill [Gary M.], or intended to kill everyone within the kill zone.

"In determining whether the defendant intended to kill [Gary M.], the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone; and (2) [Gary M.] was located within the kill zone.

"In determining whether the defendant intended to create a 'kill zone' and the scope of such a zone, you should consider all of the circumstances including, but not limited to, the following: [¶] The type of weapon used; [¶] The distance between the defendant and [Gary M.]; [¶] The distance between [Gary M.] and the primary target.

"If you have a reasonable doubt whether the defendant intended to kill [Gary M.] or intended to kill Ruben Colunga by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [Gary M.]."  (CALCRIM No. 600.)

The prosecutor argued during closing that defendant intended to kill Colunga.  Specifically, he referred to defendant's text saying that "the foo is still there" and argued that defendant and Oscar went to the scene "to target one single individual, the individual that had either punched or confronted Francisco at the fundraiser."  Defense counsel noted in closing that it was "unrefuted that Francisco was punched through his open window at least twice."  He argued, however, that the collision was an accident because defendant ducked after seeing Gary M. in a shooting stance.  Neither party's counsel expressly addressed the kill zone theory during closing arguments.

The jury found defendant not guilty of first-degree murder and guilty of second-degree murder as to Colunga.  (§ 187, subd. (a).)  The jury also found defendant guilty of attempted murder as to Gary M. and found true that

5

defendant personally inflicted great bodily injury on Gary M., but the jury found not true the allegation that the attempted murder was willful, deliberate, and premeditated.  (§§ 664, subd. (a) & 187, subd. (a)).

DISCUSSION

Defendant contends on appeal that there was insufficient evidence to support the jury instruction given on the kill zone theory of attempted murder liability with Colunga as the primary target, and that the instruction itself was an incorrect statement of the law.  We disagree.

I

On review, we determine independently whether substantial evidence supported a requested instruction.  (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055.)  An instruction on the kill zone theory is warranted "if there was substantial evidence in the record that, if believed by the jury, would support a reasonable inference that defendant intended to kill everyone within the kill zone."  (*People v. Canizales* (2019) 7 Cal.5th 591, 609–610 (*Canizales*) [cleaned up].)  As applied here, there must be: (1) evidence regarding the circumstances of defendant's attack on Colunga "that would support a reasonable inference" that defendant intentionally created a zone of fatal harm around Colunga, and (2) evidence that Gary M. "was located within that zone of fatal harm."  (*Id.* at p. 610.)  Such evidence, taken together, would permit a finding that defendant harbored the requisite intent to kill Gary M. "because he was within the zone of fatal harm" that defendant intended to create around Colunga.  (*Ibid.*)

Defendant contends the instruction was unwarranted because there was "no explanation" for why Colunga should be considered the primary victim.  Specifically, he argues that although there is evidence Colunga may have punched Francisco, "there was no evidence that [defendant] was aware

6

of that possible event, nor that he would know" who assaulted Francisco. But there was ample evidence presented at trial showing that defendant knew Francisco had been attacked. Francisco testified that he spoke with either defendant or Oscar while the assault was happening. Oscar testified that he and defendant were both at their house when Francisco first called them that night, and that defendant said they should go look for Francisco because it sounded like he was "in trouble." Cell phone records showed that Francisco exchanged multiple calls with defendant in the half-hour leading up to the incident, which indicates Francisco had opportunities to inform defendant about being attacked.

Furthermore, Oscar texted his girlfriend, "Damn dude, my bro just called me [right now] he got fucked up." Oscar's girlfriend testified that she understood the text message to mean "that his brother had got jumped," and Oscar told detectives during an interview that someone "socked" Francisco through his car window. Because evidence showed that Oscar and defendant were together and in frequent communication with each other that evening, it is reasonable to infer that defendant was aware of the same facts as Oscar. Even defense counsel acknowledged in his closing argument that the fact of Francisco getting punched was undisputed.

There is also substantial evidence to support a reasonable inference that defendant knew Colunga was the person who assaulted Francisco, which would make him the primary target. Gary M., who was present during the altercation between Francisco and party guests, told detectives that Colunga may have punched Francisco. About 15 minutes before the collision, defendant texted Oscar, "He said the foo is still there." That message supports an inference that Francisco had identified Colunga as the person who hit him, and that defendant intended to target him. The message is also

7

consistent with other testimony showing that the reason defendant went to the scene in the first place was to retaliate against whoever assaulted Francisco.

After defendant arrived at the scene, both Francisco and defendant drove by the party multiple times. A reasonable juror could infer from that evidence that Francisco had the opportunity to identify Colunga to defendant either directly or by a physical description, and that defendant also had the opportunity to see Colunga himself. Moreover, surveillance video and Francisco's testimony showed that mere minutes before the collision, Francisco and defendant spoke to each other at a nearby intersection. Both video evidence and witness testimony placed Colunga in the same area when that conversation occurred, which supports an inference that Francisco had the opportunity to point out Colunga to defendant then. We conclude, therefore, there was substantial evidence to support giving a kill zone instruction because the evidence would permit a finding that defendant intended to create a zone of fatal harm around Colunga as the primary target in retaliation for his assault on Francisco. (See *Canizales, supra*, 7 Cal.5th at p. 610.)

## II

Defendant next contends that the kill zone instruction, as given, was an incorrect statement of law. Specifically, defendant argues that the instruction was erroneous because it did not require the jury to find he intended to kill everyone in the area around the primary target "*in order to ensure the death of the primary target.*" When the alleged error is that the instructions misstate the law, we independently review the instructions to determine whether they correctly conveyed the law, or "whether there is a

8

'reasonable likelihood' that the jury understood the charge as the defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525.)

As defendant points out, CALCRIM No. 600 was revised after our Supreme Court's decision in *Canizales*, which held that the kill zone theory does not apply unless the evidence shows the defendant intended to kill everyone in a particular area *as a means of ensuring the death of a primary target*. (See *Canizales, supra*, 7 Cal.5th at p. 607, fn. 5.) But as defendant acknowledges in his opening brief, the trial court here used the revised version of CALCRIM No. 600, which included language instructing the jury that if there was "a reasonable doubt whether the defendant intended to kill [Gary M.] or intended to kill [Colunga] *by killing everyone in the kill zone*, then you *must* find the defendant not guilty of the attempted murder of [Gary M.]." (CALCRIM No. 600, italics added.) Defendant claims the instruction is faulty because the required language was not made "an element" of the offense. We recognize that Justice Liu has criticized the revised instruction for lack of clarity. (See *People v. Mumin* (2023) 15 Cal.5th 176, 223 (conc. opn. of Liu, J.) [observing that the revised instruction could still lead to juror confusion].) We must, however, consider the instructions as a whole and presume that "jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [cleaned up].) Moreover, we interpret instructions, when possible, "so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*Ibid.*)

The kill zone instruction given here did instruct the jury that if it had "a reasonable doubt whether the defendant intended to kill [Gary M.] or *intended to kill* [*Colunga*] *by killing everyone in the kill zone*," then the jury

9

could not find him guilty under that theory. (CALCRIM No. 600, italics added.) It also defined the kill zone as "an area in which the defendant used lethal force that was designed and intended to kill everyone *in the area around the primary target*." (*Ibid.*, italics added.) The jury was admonished to "pay careful attention to all" of the instructions and to "consider them together." (CALCRIM No. 200.) Considered in their entirety, these instructions adequately informed the jury of the requirement that the defendant "intended to kill everyone in the kill zone *as a means of killing the primary target . . . .*" (*Canizales, supra*, 7 Cal.5th at p. 607, fn. 5, italics added.) Because the kill zone instruction correctly conveyed the law to the jury, we conclude the instruction was not erroneous and thus we need not decide whether any error would have been harmless.

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

10