Filed 10/16/20  P. v. Kohrs CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER J. KOHRS,<br><br>        Defendant and Appellant. | A154295<br><br>(City & County of San Francisco Super. Ct. No. 227677) |

Defendant Christopher Kohrs appeals from a judgment after his felony conviction on two counts of leaving the scene of an accident resulting in injury (Veh. Code, § 20001, subd. (a)) and a special allegation that one of the offenses resulted in permanent, serious injury under Vehicle Code section 20001, subdivision (b)(2).  He asserts the trial court erred by failing to instruct the jury on the duress defense and that the prosecutor committed misconduct during closing arguments by making misstatements of facts and law.  We affirm.

## BACKGROUND

On June 29, 2017, the San Francisco District Attorney filed an information charging defendant with two counts of leaving the scene of an accident resulting in injury (Veh. Code, § 20001, subd. (a); counts I and II).  As to the second count, the information alleged the offense resulted in permanent, serious injury (*id.*, § 20001, subd. (b)(2)).  On March 15, 2018, a

1

jury found defendant guilty as charged and found true the allegation that one of the offenses resulted in permanent, serious injury. Defendant was sentenced to three years of probation, including a jail term of nine months.

## I. Prosecution Case

On the evening of Saturday, November 28, 2015, defendant, his brother N.K., and his friend Norman B. went out to Fort One, a club in San Francisco. Defendant was a San Francisco police officer known online and in the news media as the " 'Hot Cop of the Castro.' " He was the designated driver. All three were at the club from approximately 11 p.m. until 2:30 or 2:45 a.m. After they left the club, defendant drove his car into two pedestrians who were crossing the intersection of Broadway and Montgomery Street against the traffic signal. N.K. and Norman B. were passengers in the car. After the collision, defendant slammed on the brakes and stopped. He, N.K., and Norman B. exited and walked to the rear of the car. Norman B. testified that while they were huddled at the rear of the car, they were all saying, " 'Oh, shit. What do we do; what do we do?' " Defendant paced back and forth. There were groups of people on each side of the street; the crowd came toward the car, and some people were taking video. Some members of the crowd recognized defendant. Norman B. heard multiple people use defendant's moniker, " 'Hot Cop.' "

Norman B., who is a medical doctor, walked toward one of the injured pedestrians to render medical assistance. He realized, however, that he had had too much to drink to safely provide assistance to the seriously injured man, who was bleeding from the back of his head. Norman B. did not call 911 because a bystander helping one of the injured pedestrians did so.

Norman B. testified that defendant did not approach the injured pedestrian with him. When Norman B. walked back toward the car, he did

2

not see defendant.  Norman B. asked N.K. where was the defendant.  N.K. responded that he did not know.  Norman B. walked about half a block down Montgomery Street to search for defendant but did not find him.

Norman B. felt that the area was not very safe around 2:30 a.m., and he was fearful.  He did not see or hear anyone physically or verbally threaten or display aggression against himself, defendant, or N.K.  He could not tell if the crowd was "an angry mob or not," but he was concerned there were people in the crowd who could have been angry.  Before the defendant left, he did not tell Norman B. that he believed he was in danger.  Neither defendant nor N.K. rendered aid to the injured pedestrians.  Further, defendant was not present when the police arrived to give his name and vehicle registration.

Norman B. did not know how much defendant drank while they were out.  However, he opined that defendant was not inebriated when he got into the car and that he was able to drive.

A witness, Kevin C., who worked at a club near the intersection of the accident, heard the collision and called 911.  He observed a crowd around the scene of the accident but did not hear any shouting from the crowd.  He testified that it did not appear that anyone was in danger other than the injured pedestrians.  He recalled that police arrived 10 to 15 minutes after the collision.

Jess Z. witnessed the accident from his parked car, which was facing the intersection.  He also called 911 and approached the rear of defendant's car to give the 911 dispatcher the license plate number.  Jess Z. testified that the police arrived within three to five minutes.  He was about 30 to 50 feet away from the injured pedestrians.  He did not see anyone make physical threats, but he saw people waving their hands at uniformed police officers in a threatening manner.  He testified the crowd seemed to be angry at the

3

occupants of the car. After a person moved away from the injured pedestrians, Jess Z. heard verbal threats directed at someone associated with the vehicle and saw a group of four or five people yelling, " 'Stop, you son of a bitch. Stop, bitch. This is what you do to us. This is what the police do to us. F-u-c-k this, f-u-c-k that,' " and, " 'Please stop. Where are you going? Hey you, stop.' "

At the time of the accident, San Francisco Police Sergeant Donald Jackson was stationed in his patrol car down the street from the intersection where the accident occurred. He was stationed in this area because there was a history of people becoming rowdy and violent when leaving the clubs and bars in the area. Sergeant Jackson was notified about the accident around 2:15 a.m. when a passerby knocked on the window of his patrol car. He arrived on the scene within a minute and rendered aid to the two victims. Sergeant Jackson did not see the defendant; nor did defendant approach him to identify himself as the driver of the vehicle. Sergeant Jackson testified there was a large crowd of more than 100 people at the scene, but he did not observe any aggression from the crowd toward either civilians or uniformed police officers.

Officer Horan also responded to the scene and learned from another officer that the car involved in the accident was registered to defendant. At that point, Sergeant Jackson recognized defendant's name because he had worked with him a couple of times. When he was told that the car involved in the accident belonged to defendant, he was surprised because defendant had a reputation for following rules. Officer Horan also had previously met defendant and knew what he looked like. He saw two people walking on Broadway, one of whom had the same features and build as defendant. He called out, " 'Hey Chris,' " and the men turned around. Officer Horan asked

4

them to return to the scene and provide their identification. The two men were Norman B. and N.K.

Lieutenant William Braconi, who was in charge of internal affairs criminal investigations in the San Francisco Police Department, spoke with Norman B. and N.K. at about 5:15 a.m. on November 29th. He asked each of them to contact defendant. N.K. refused to call defendant. Norman B. attempted to call defendant but did not reach him because defendant's cell phone was left in the car. Lieutenant Braconi went to defendant's residence about 9:00 a.m. and knocked or rang the doorbell, but there was no answer. Defendant called Lieutenant Braconi sometime between 9:30 a.m. and 10:00 a.m., and they discussed defendant's self-surrendering. At 11:00 a.m. defendant came to police headquarters and met with Lieutenant Braconi.

## II. Defense Case

The court admonished the jury that it had "taken judicial notice of the fact that there was some presence of the defendant's name and photograph in news media in San Francisco in 2015 before November 29th, 2015."

N.K., the defendant's brother, testified that at about 10:30 p.m. on November 28th, he, Norman B., and the defendant met at defendant's house before all three drove to Fort One. They did not drink before they left. Defendant was the designated driver. N.K. was near defendant most of the night while they were at Fort One and did not see defendant drink, but he was not certain whether defendant consumed any alcohol. N.K. did not believe defendant was intoxicated and testified he "was good to drive."

Just after the accident, N.K. saw defendant exit the car and run toward one of the victims, lean over and check the one victim. N.K., however, could not tell exactly what defendant did to check on the victim. At that point, a crowd of close to 100 people came toward them, and N.K. heard someone say,

5

" 'Hey, that's the Hop Cop [*sic*],' " and, " 'Yeah, it's the Hop Cop [*sic*].' " Then he heard, " 'Fuck the police, fuck that pig,' " " 'Fuck the Hop Cop [*sic*],' " and, " 'Beat his ass, beat his ass.' " He saw people throw sports bottle drinks toward the trio when they were near the car. N.K. saw defendant pacing, which is something he did when he was scared. He heard the defendant say to himself something like, " 'Get here soon. Get here soon.' " Defendant looked scared, and N.K. feared for defendant's physical safety.

Defendant instructed N.K. to call the police, to make sure the two victims were taken care of, and to answer any questions by the police. After N.K. was given these instructions, he did not see defendant. Defendant did not tell N.K. where he was going, and N.K. did not see him leave the scene. N.K. did not call the police because he saw others doing so. When the police arrived, N.K. stayed on the scene, and eventually he was taken to the police station for an interview. N.K. answered questions but refused the police officers' request to call defendant. He told the police that defendant had instructed him to call police and get help for the pedestrians. N.K. told the police there was a crowd, but he did not mention an angry mob. He did not tell the police that anyone had said, " 'Fuck Hot Cop,' " " 'Fuck the police,' " " 'Fuck the pig,' " or, " 'Beat his ass.' " Further, he did not tell the police that someone in the crowd threw sports drinks at him, defendant, and Norman B. He told the police that defendant looked distraught and scared. He also said in his police interview that he believed defendant was " 'under a lot of duress from what he saw' " and that it was " 'something that he couldn't handle.' "

Retired Police Lieutenant Mark Solomon testified as a character witness on behalf of defendant. He testified that he supervised defendant for about a year and that he had a high opinion of defendant's character.

6

Defendant testified that he gained notoriety after someone took his picture while he was on duty in the Castro District and posted it on the Internet; he became known as the " 'Hot Cop of the Castro.' " On the night of November 28, 2015, defendant was off duty, and he met his brother N.K. and Norman B. at his home before going out to Fort One. Defendant was the designated driver. He was at the club for about two hours, and he had one or two shots of hard liquor while he was there. Although he did not remember the exact type of alcohol he consumed, he testified that it did not make him inebriated or buzzed. As he was driving within the speed limit upon a fairly steep hill, he heard a thud and saw his windshield crack. He slammed on the brakes and immediately got out of the car and went to check on one of the pedestrians. He gently nudged one of the pedestrians and asked if he was okay, but there was no response. He did not go check on the other pedestrian because he heard someone say, " 'Hot Cop. Fuck the police,' " and other "threats" such as, " 'Fuck you, pig. Beat his ass; beat his ass.' " The people making the threats were very aggressive, and defendant thought they sounded like they "really wanted to hurt" him. He saw a crowd of people moving toward him. He returned to his car and paced back and forth.

After he stopped pacing, he told N.K., " 'Call 911, get help for these guys, and answer any questions the police have.' " Sometime after instructing N.K., defendant left because he was scared of the belligerent crowd threatening him and he thought that he had just killed two people. He ran up Montgomery Street because he was scared of being injured. He saw people chasing him when he looked back, but he could not say how many. He did not remember hearing anyone yelling for him to stop or asking where he was going. After he turned several corners, he lay down behind some bushes and passed out from a panic attack.

7

Eventually, defendant woke up and took a cab to his friend Leslie's house in San Bruno. At 9:00 a.m., after N.K. told defendant that the department's internal affairs unit was looking for him, defendant called the police. He met with the police at 11:00 a.m. and took a field sobriety test sometime after 11:00 a.m. Defendant denied running because he was afraid to submit to a field sobriety test, which he believed he would have passed. But he knew from his police training what types of evidence would have been collected if he had remained on the scene, and he knew that by the time he took the field sobriety test after 11:00 a.m., whatever alcohol may have been in his system would have dissipated.

Defendant admitted he did not remain at the accident scene to provide his name, address, or car registration to the police. He knew there was a police station "relatively" close to the scene of the accident, but he did not go there because he was running "blindly" and he believed he had done everything he was supposed to do by telling N.K. to call for help and to answer any questions by the police. Defendant acknowledged that once the police arrived they may have wanted to speak with him as the driver of the vehicle. Defendant never made a police report about being threatened at the scene of the accident; nor did he ask any bystanders for help.

## DISCUSSION

### I. Failure to Give Duress Instruction Was Not Erroneous

Defendant argues the trial court erroneously refused to instruct the jury on the duress defense. Defendant requested both CALCRIM No. 3403, explaining the necessity defense, and CALCRIM No. 3402, the duress instruction. The trial court instructed the jury on the necessity defense (CALCRIM No. 3403) as follows:

"The defendant is not guilty of VC 20001(a) if he acted because of legal necessity.

"In order to establish this defense, the defendant must prove that:

"1. He acted in an emergency to prevent a significant bodily harm or evil to himself;

"2. He had no adequate legal alternative;

"3. The defendant's acts did not create a greater danger than the one avoided;

"4. When the defendant acted, he actually believed that the act was necessary to prevent the threatened harm or evil;

"5. A reasonable person would also have believed that the act was necessary under the circumstances;

"AND

"6. The defendant did not substantially contribute to the emergency.

"The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the defendant must prove that it is more likely than not that each of the six listed items is true."

Defendant asked that the jury be instructed on the duress defense[1] as well, but after an unreported conference in chambers, defendant withdrew

---

[1] CALCRIM No. 3402 states: "The defendant is not guilty of <*insert crime[s]*> if (he/she) acted under duress. The defendant acted under duress if, because of threat or menace, (he/she) believe that (his/her/ [or] someone else's) life would be in immediate danger if (he/she) refused a demand or request to commit the crime[s]. The demand or request may have been express or implied. [¶] The defendant's belief that (his/her/ [or] someone else's) life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the

9

his request because "the facts in this case do not support [the duress] instruction," but he stated he would argue duress in the colloquial sense.[2] During closing argument, defense counsel argued two theories: first, that defendant "performed his required duty" and "did what he was supposed to do, despite the fact that he was under duress. And despite the fact that . . . the situation necessitated him leaving the scene"; and, second, that defendant "did not leave willfully."

We find no instructional error. As explained in *People v. Saavedra* (2007) 156 Cal.App.4th 561, 567, "Duress is available as a defense to defendants who commit a crime 'under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.' (Pen. Code, § 26, subd. six; [citation].) An

---

circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed. [¶] A threat of future harm is not sufficient; the danger to life must have been immediate. [¶] [The People must prove beyond a reasonable doubt that the defendant did not act under duress. If the People have not met this burden, you must find the defendant not guilty of *<insert crime[s]>*.]"

[2] Following the unreported conference in chambers, the trial court stated on the record, "The defense . . . asked for the duress instruction under . . . CALCRIM 3402," and inquired whether defense counsel "wish[ed] [to] be heard on that." Defense counsel replied, "Only to the extent that I withdraw that request. I think that, during our chambers conference, it was pointed out to me in the course of our discussion that that's *legal* duress, and that the facts of this case do not support that instruction. But I also brought up the fact that, if I had an argument about duress, that I could do that, just so long as I didn't try to insinuate or state that it's a *legal* duress." The trial court then stated: "All right, okay. [¶] Having reviewed that instruction and discussing it with counsel, the Court did not feel that it was appropriate to give the duress instruction; that the evidence did not support that. [¶] And looking at what was required here under this instruction, it just didn't seem appropriate, so the Court declined to give that."

essential component of this defense is that the defendant be faced with a direct or implied demand that he or she commit the charged crime. 'The defense of duress, unlike the necessity justification, requires that the threat or menace be accompanied by a direct or implied demand that the defendant commit the criminal act charged.' [Citation.] In contrast, the necessity defense is available when the defendant reasonably believed there was a threat of harm and no other means to alleviate the harm, and the harm sought to be avoided by the defendant's conduct was greater than the harm sought to be prevented by the law defining the charged offense. [Citations.]"

"Duress is an effective defense only when the actor responds to an immediate and imminent danger. '[A] fear of *future* harm to one's life does not relieve one of responsibility for the crimes he commits.' [Citations.] The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent. 'The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea . . . .' [Citation.] Thus, duress negates an element of the crime charged—the intent or capacity to commit the crime—and the defendant need raise only a reasonable doubt that he acted in the exercise of his free will. [Citation.]" (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.)

" 'It is well settled that a defendant has a right to have the trial court . . . give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was

11

sufficient to raise a reasonable doubt . . . ." [Citations.]' On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence . . . ." (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

Here, the trial court correctly ruled that the evidence did not support a duress defense. Defendant and N.K. testified that people in the crowd recognized defendant and yelled his moniker, " 'Hot Cop,' " as well as, " 'Beat his ass,' " and, " 'Fuck the police,' " but these verbal threats suggest the possibility of harm in the immediate future, which supports the necessity defense but not the duress defense. (See *People v. Heath*, *supra*, 207 Cal.App.3d at p. 901 [for the necessity defense, "[u]nlike duress, the threatened harm is in the immediate future, which contemplates the defendant having time to balance alternative courses of conduct"].) Even N.K.'s testimony that someone threw sport drink bottles at the trio does not amount to an "immediate and imminent danger" to life. (CALCRIM No. 3402.) Moreover, there was no evidence that anyone made an express or implied demand that defendant leave the scene of the accident. Rather, the evidence was that members of the crowd yelled, " 'Please stop. Where are you going? Hey you, stop.' " (See *People v. Steele* (1988) 206 Cal.App.3d 703, 707 [substantial evidence did not support essential element of duress defense where "[t]here is no indication that those making the threats requested, demanded or desired that [prison inmate] escape"].)

Defendant asks us to relax the duress defense's requirement of a demand that defendant commit a crime, arguing that "[at] least in a case that simply involves running away and thereby allegedly omitting to undertake a legal duty, a defendant should not be required to prove that someone demanded that he abstain from his duty in order to present a duress defense." According to defendant, the defense should apply even without a

specific demand as long as "the defendant's fear arises from a blunt threat requiring flight . . . ." Defendant's request is contrary to the principles underlying the duress defense, in which the " 'unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea . . . . [Citation.] Thus, duress negates an element of the crime charged—the intent or capacity to commit the crime . . . ." (*People v. Heath*, *supra*, 207 Cal.App.3d at p. 900.) Without a demand to commit a crime, there is no transference of the mens rea and the duress defense does not apply. (*Ibid.*)

Defendant argues that even though defense counsel withdrew his request for the duress instruction following the conference in chambers, this did not relieve the court from its sua sponte duty to provide the instruction because it was not " 'clear from the record that defense counsel made an express objection to the relevant instructions' and that 'counsel acted for tactical reasons and not out of ignorance or mistake.' " (*People v. Wickersham* (1982) 32 Cal.3d 307, 330, disapproved on other grounds by *People v. Barton* (1995) 12 Cal.4th 186, 201.) Of course, here defense counsel did not object to the instruction but requested it and then, following a conference in chambers, withdrew the request. Nonetheless, defendant asserts it is not clear from the record that defense counsel acted for tactical reasons. We find the record of the postchambers conference discussion suggests that defense counsel's withdrawal of his request for the duress instruction was not "out of ignorance or mistake," but rather was because defense counsel understood that "the facts in this case do not support that instruction" and his strategy—which he executed in closing argument— was to argue "about duress . . . just so long as [he] didn't try to insinuate or state that it's a *legal* duress." Thus, it appears defense counsel made a tactical decision to withdraw his request for the

13

instruction and to continue referring to duress in its colloquial, nonlegal sense in support of defendant's necessity defense. Accordingly, defendant has forfeited any claim the trial court had a sua sponte duty to instruct on the duress defense. (See *People v. Wader* (1993) 5 Cal.4th 610, 657–658 ["When a defense attorney makes a 'conscious, deliberate tactical choice' to forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was omitted in error"].)

But even if we assume defense counsel's withdrawal of his request for the duress instruction is not a forfeiture, we find the trial court did not have a sua sponte duty to give the instruction.

In criminal cases, even in the absence of a request, the trial court has a sua sponte obligation to instruct on " ' "principles [of law] closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The court's duty to instruct extends to defenses "if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendants' theory of the case." (*People v. Sedeno* (1974) 10 Cal.3d 703, 716 (*Sedeno*), overruled on other grounds in *Breverman*, at pp. 149, 173.) Defendant argues *Sedeno* provides a two-prong, disjunctive test such that the trial court's sua sponte duty arises when either the defendant relies on the defense *or* the defense is supported by substantial evidence and consistent with the defense raised at trial; defendant argues both prongs are satisfied here. We concluded above that substantial evidence did not support the duress defense. Nor are we convinced that defendant "relied on" a duress

14

defense.[3]  It is true that defense counsel referred to duress in his opening statement and closing argument, but defense counsel acknowledged "the facts in this case do not support [the duress] instruction" but that he would argue to the jury "about duress . . . just so long as [he] didn't try to insinuate or state that it's a *legal* duress."  The fact that defense counsel argued defendant was under duress in the colloquial sense does not constitute reliance upon the duress defense, particularly where defendant correctly acknowledged the facts did not support such a defense.  We agree with the People that counsel's reference to duress in closing argument was in line with his strategy of arguing defendant acted under duress in the colloquial sense.  This is not

---

[3] In *People v. Shelmire* (2005) 130 Cal.App.4th 1044, the Third District Court of Appeal concluded that the first prong of *Sedeno*'s disjunctive test has been overruled by subsequent decisions, including *People v. Flood* (1998) 18 Cal.4th 470, 480, which disapproved of *Sedeno* to the extent it suggested a duty to instruct " ' "whenever any evidence is presented, no matter how weak" ' " (*Shelmire*, at p. 1058), and *Shelmire* departed from the first prong "because it is illogical . . . to allow a defendant to receive an instruction on a defense, and to allow a jury to excuse criminal conduct, when the defendant purports to rely on a defense for which substantial evidence does not exist." (*Id.* at p. 1059.)  *Shelmire* explains that "neither in *Sedeno* nor in any later case has the high court used the first prong of the *Sedeno* test to require instruction on a defense for which there is no substantial evidence."  (*Id.* at p. 1058 [citing multiple California Supreme Court cases as examples].)  Defendant cites *People v. Brooks* (2017) 3 Cal.5th 1, 73, as a more recent Supreme Court case referencing *Sedeno*'s two-part, disjunctive test, as well as *People v. May* (1989) 213 Cal.App.3d 118, 125, and *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1660–1667, both from this district, which state the *Sedeno* test is disjunctive.  But in none of the cases cited by defendant did the court hold that an instruction was required because a defendant relied upon a defense for which there was no substantial evidence. (*Brooks*, at pp. 73–74; *May*, at p. 126; *Meneses*, at p. 1665.)  We find *Shelmire*'s analysis and reasoning to be persuasive, but because the Supreme Court recently restated *Sedeno*'s disjunctive test in *Brooks*, at p. 73, we proceed with an analysis of each prong of *Sedeno*.

15

equivalent to relying on the legal duress defense, the elements of which defense counsel did not articulate for the jury and for which there was no substantial evidence.

## II.  No Prosecutorial Misconduct

Defendant argues the prosecutor committed prejudicial misconduct during closing arguments by: (1) suggesting that defendant left the scene because he was intoxicated and hoped to avoid an investigation; (2) misstating facts regarding a conversation between Norman B. and N.K.; (3) pointing out inconsistencies between defendant's testimony and that of other witnesses; (4) asserting that N.K. knew where defendant went; and (5) misstating the law regarding the duty to render reasonable assistance under Vehicle Code section 20001, subdivision (a).  Defendant acknowledges that his trial counsel did not object to the alleged misstatements of fact and law but argues that this failure constituted ineffective assistance of counsel.  We find no prosecutorial misconduct during closing argument, and therefore defendant's trial counsel was not ineffective for failing to object to the prosecutor's statements.

### A.  *Suggestions That Defendant Left Scene to Avoid an Investigation as to Whether He Was Intoxicated*

Defendant complains the prosecutor repeatedly suggested during closing argument that he left the scene of the accident because he was intoxicated and did not want to present himself for investigation.  Defendant argues that this suggestion was contrary to the evidence because defendant, N.K., and Norman B. testified that defendant was not intoxicated.  " ' "It is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' "  (*People v. Williams* (1997) 16 Cal.4th 153, 221.)

16

The prosecutor did not state that the defendant was intoxicated, but he argued that defendant left the scene to avoid a criminal investigation. The prosecutor argued defendant fled "[t]o avoid more serious charges. [¶] Because if anything is detected in your blood while driving and someone is seriously hurt, there will be questions. [¶] And at the time of the collision, Christopher Kohrs did not know what his blood result would be. He didn't know. [¶] He didn't take a breath test or a blood test right before he left. He had no idea. [¶] But that's where the fear generated from, the not knowing. So he ran. [¶] And the more time that passed, the less chance of evidence being collected from Kohrs." We find the prosecutor's argument to be a fair comment on the evidence, which included defendant's own testimony that he left the scene, that he had consumed two shots of hard liquor before the accident, and that as a police officer he knew the investigation was likely to include sobriety tests.

**B.** ***Facts Regarding Conversation Between Norman B. and N.K.***

Defendant complains the prosecutor avoided asking Norman B. about defendant's instructions to N.K. and then improperly argued in closing that because Norman B. did not testify regarding the instructions, the jury should not believe that defendant gave instructions to N.K. On direct examination, Norman B. testified that when he returned to the parked car after determining he was too intoxicated to render medical assistance to the victims, he scanned the area for defendant. Norman B. "did not notice him. [¶] And then [he] asked [N.K.] if he knew where Chris went." The prosecutor said, "Okay, let's take this—just answer this question . . . ." Norman B. replied, "Sure," and the prosecutor asked, "Did you receive a response from [N.K.]?" When Norman B. said, "Yes," the prosecutor asked, "What did you do after you received a response from [N.K.]?" Norman B. replied, "I went up Montgomery. . . . [¶] . . . I walked up about half a block to search for Chris."

17

When the prosecutor asked, "And why were you searching for Chris?" Norman B. answered, "Because [N.K.] said that he didn't know where [defendant] was, and I did not see him on the scene. [¶] So I was searching for him to see where he was."

On cross-examination, defense counsel elicited from Norman B. that he did not know what N.K. and defendant did during the period when Norman B. went toward one of the injured pedestrians and then returned.

During closing argument, the prosecutor commented on Norman B.'s testimony as follows: "He asks [N.K.] where the defendant was; [N.K.] doesn't know. And please notice what was *not* said by [N.K.] through Norman [B.], that Chris had to get away from a crowd or 'Don't worry, Norm, I have instructions' or 'I'll call 911, you take care of the injured.' [¶] None of that was said. [¶] Why do I mention that? Because you have to determine whether Christopher Kohrs gave reasonable assistance. . . . [¶] Because at the end of the day, he didn't do anything. [¶] And they're trying to tell you, 'I told my brother to do it.' And you have to determine whether that's reasonable."

Defendant argues the prosecutor avoided presentation of evidence as to the substance of Norman B.'s conversation with N.K. and therefore it was improper for the prosecutor to argue that N.K. did not tell Norman B. that defendant gave him instructions or that defendant said he was scared of the crowd. We find the prosecutor's argument was a reasonable inference and a fair comment on the evidence. Norman B. testified he did not know what transpired between N.K. and defendant during the period when Norman B. went toward one of the injured victims and then returned. When Norman B. returned, the defendant was gone, and N.K. told Norman B. that "he didn't know where [defendant] was . . . ." This testimony could support a

18

reasonable inference that N.K. did not tell Norman B. that defendant said he was afraid of the crowd and that he had given N.K. instructions. (See *People v. Lawley* (2002) 27 Cal.4th 102, 156 [prosecutor's comment on absence of evidence presented at trial was a "fair comment on the evidence"].)

**C.** ***Inconsistency Between Testimony of Defendant and Other Witnesses***

Defendant argues the prosecutor misstated facts when he questioned the credibility of defendant's testimony that he was chased from the scene on the basis that it was inconsistent with the testimony of Norman B., Jess Z., Sergeant Jackson, Officer Horan and Kevin C. The prosecutor argued defendant's testimony was not credible "[a]nd it is his burden to prove to you that there was a legal necessity by a preponderance of the evidence. [¶] But he can't even say how; where; who chased him; when. [¶] And it's inconsistent with the testimony of Norman [B.] who did not see the chase; Jess [Z.], who saw people gathered around, but the reaction was, 'Stop!' [¶] There was already flight. There was already flight. And that's an issue. That doesn't bode well for the defendant. He was running, and that's why people were reacting. [¶] That is the logical inference. He was already on the run. [¶] Inconsistent with Sergeant Donald Jackson, who didn't see anything unusual, and Officer Horan, who actually stopped . . . [N.K.] and Norman [B.] [¶] Kevin [C.] testified. And he didn't see anything really remotely close to what Christopher Kohrs testified to."

Defendant argues there was no inconsistency between these witnesses' testimony and defendant's testimony that he was chased from the scene because Sergeant Jackson, Officer Horan, and Kevin C. testified they did not see defendant; Norman B. testified he had "no idea" what happened to defendant; and Jess Z. recalled members of the crowd "running and yelling at an individual to stop him." The prosecutor's argument that the testimony of

19

Sergeant Jackson, Officer Horan, Kevin C. and Norman B., who were on the scene either at the time of the accident or shortly thereafter, was inconsistent with the defendant's testimony is a fair comment on the evidence. (*People v. Williams, supra*, 16 Cal.4th at p. 221.) The fact that these witnesses did not see a chase is inconsistent with defendant's version of events. Further, the prosecutor's argument that crowd members were angry defendant fled the scene and yelled to stop him was supported by Jess Z.'s testimony and was inconsistent with defendant's testimony.

### D. *Assertion That N.K. Knew Where Defendant Went*

The prosecutor argued N.K.'s testimony was not credible because he wanted to protect his brother. He further argued N.K. refused to cooperate with the police, stating: "[N.K.] knew where Christopher Kohrs was. He was at Leslie's house, remember that? [¶] Remember . . . Christopher Kohrs testified that [N.K.] called him and told him that . . . Internal Affairs . . . wanted to talk to Christopher Kohrs? [¶] And this was after, *after*, [N.K.] did not cooperate with SFPD. See, [N.K.] knew where Christopher Kohrs was. Why didn't he cooperate? [¶] [N.K.] did not tell the police where Kohrs was. . . . He didn't cooperate. [¶] What does that tell you about [N.K.]? . . . [N.K.] refused to call the defendant . . . when asked by Lieutenant Braconi. But he knew. [¶] Why did [N.K.] elect to not call the defendant while Lieutenant Braconi is there, knowing that he was probably at Leslie's house, at some point? [¶] Well, [h]e has an agenda to protect his brother. That's the agenda, right there. That's your evidence. [¶] That's evidence that he knew, but didn't want to cooperate with the police. [¶] He protected his brother at the scene by not telling police immediately what had happened. He protected his brother at the station by not trying . . . to contact Christopher Kohrs." Defendant contends there was no evidence that at the time of N.K.'s police

interview, he knew defendant was at a friend's house in San Bruno, and that N.K. testified that he did not know where defendant went.

We agree with the People that the evidence supports an inference that N.K. knew where defendant went and therefore the prosecutor's argument was not improper. The evidence showed that when N.K. was interviewed by the police in the early morning after the accident, he refused to contact defendant. N.K. testified he saw defendant six to seven hours after the collision, when he "went to drop off some clothes to him." Defendant testified that N.K. told him the internal affairs unit was looking for him. N.K.'s refusal to contact defendant when the police requested he do so, and his testimony that later that day he went to defendant's friend's house to drop off clothes to him, is sufficient to support an inference that N.K. knew where defendant was but refused to contact him at the request of the police in order to protect defendant. (*People v. Williams*, *supra*, 16 Cal.4th at p. 221.)

E.  ***Prosecutor's Statements About N.K.'s Not Aiding Victims and Defendant's Failure to Follow Up***

The jury was instructed with CALCRIM No. 2140 (failure to perform duty following accident: death or injury), which states: "To *provide reasonable assistance* means the driver must determine what assistance, if any, the injured person needs and make a reasonable effort to see that such assistance is provided, either by the driver or someone else. *Reasonable assistance* includes transporting anyone who has been injured for medical treatment, or arranging the transportation for such treatment, if it is apparent that treatment is necessary or if an injured person requests transportation. The driver is not required to provide assistance that is unnecessary or that is already being provided by someone else. However, the requirement that the driver provide assistance is not excused merely because bystanders are on the scene or could provide assistance."

21

Defendant argues the prosecutor misstated the law when he suggested defendant failed to provide " 'reasonable assistance' " because N.K. did not actually render aid to the victims after defendant asked him to do so and because defendant did not " 'follow[] up' " on the victims' condition in the hours after the accident. We find no error. The prosecutor's argument focused on whether delegation of defendant's duty to N.K. constituted a "reasonable effort to see that [reasonable] assistance is provided" to the victims. (CALCRIM No. 2140.) Regarding the lack of follow-up, the prosecutor argued, "[I]f you believe that those . . . requests [to N.K.], given all the circumstances in this case—given that they were at Fort One drinking—if you think that is a reasonable effort, and you're discounting the fact that reasonable efforts can also include, maybe an hour later, checking up to see if something was done—that's part of 'effort,' making a reasonable effort that such assistance was provided by someone else, okay? [¶] If you believe that that's reasonable to not follow up; to be missing from 2:23 in the morning until past 9:00 in the morning, if you think that's reasonable, then so be it. [¶] But it's not. It's not. [¶] And that is why the defense theory of delegating this duty to [N.K.] and [N.K.] simply receiving the communication, but then doing nothing about it, that's why it fails." Under the circumstances of this case, there was nothing improper about the prosecutor's argument. (See *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1027 [statutory duty to render reasonable assistance is not nullified merely because bystanders are on the scene or offer assistance where evidence reflects driver fled scene without ascertaining "whether any of the bystanders were in fact rendering the kind of assistance mandated by Vehicle Code section 20003"].)

22

## DISPOSITION

We find no instructional error or prosecutorial misconduct.  The judgment is affirmed.

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A154295/*People v. Christopher J. Kohrs*

24