Filed 7/31/25  P. v. Chandra CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANURAG CHANDRA,<br><br>    Defendant and Appellant. | D085719<br><br><br>(Super. Ct. No. RIF2000290) |

APPEAL from a judgment of the Superior Court of Riverside County, Valerie Navarro, Judge.  Affirmed.

Law Offices of Visco & Selyem and Joshua Peter Visco, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

After deliberating for approximately two and one-half hours, a jury convicted Anurag Chandra of three counts of murder in the first degree (Pen.

Code,[1] § 187, subd. (a); counts 1, 2, and 3) and three counts of attempted murder (§§ 187, subd. (a), 664; counts 4, 5, and 6).  The court sentenced Chandra to an aggregate term of 21 years to life in prison plus life without the possibility of parole.

Chandra appeals, challenging a variety of prosecutorial conduct, the efficacy of his counsel, evidentiary decisions, and the instructions received by the jury.  He further alleges that these purported errors, taken cumulatively, denied him due process of law.

We conclude there was no error.  Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *The People's Case-in-Chief*

In January 2020, then 14-year-old J.I. gathered with five church friends following Sunday services.  The group included J.I.'s older brother, Jacob, as well as Drake Ruiz, Daniel, J.H., and S.C.  The boys planned a sleepover in belated celebration of Jacob's 18th birthday.  They played games and the group dared J.I. to either jump in the neighbor's pool or "ding dong ditch" and "moon" whoever answered the door.  J.I. selecting the ding dong dare, believing it to be the safer option.

To complete the dare, S.C. drove the boys in his Toyota Prius; J.I. sat in the front seat.  The four other boys sat in the back row.  The group saw a house that had LED lights visible from the street and assumed a teenager lived there.  J.I. believed it would be safer to select that house because a teenager lived there; he was nervous about his task.  With their selection made, S.C. parked in front of the house and J.I. exited the car.

J.I. approached the house, knocked quietly on the door, rang the doorbell, and lowered his pants to expose his buttocks.  When J.I. heard

---

[1]    Further undesignated references are to the Penal Code.

someone begin opening the door, he ran back to the car. He identified Chandra as the man who emerged from the residence and heard Chandra following him. J.H. similarly identified Chandra as the man who left the home. J.I. and J.H. explained that after the boys drove off, a white car, later identified as Chandra's Infinity, began following them. Similarly, S.C. remembered a car making contact with the Prius at least twice, nudging the Prius forward. J.I. described the car hitting the Prius "three or four" times.

At one point, the Infinity veered toward the Prius and S.C. pulled to the side of the road and stopped briefly before reversing, turning around, and driving away. After this encounter, S.C. described watching the car's headlights growing closer in his rear view mirror before he felt impact. Security footage from nearby businesses revealed the Infinity closely following the boys.

Following the Infinity making impact with it, the Prius hit a street sign, telephone pole, and a large tree before coming to rest. Another driver reported seeing a white car in the area with a "destroyed front" end, driving without the headlights on and dragging its front bumper. After the driver spotted the wrecked Prius, she stopped and directed her passenger to call for emergency services. While they waited with the boys, she saw the white car pass, slowing before it drove away.

Responding highway patrol officers Craig Mogi and Lucas Biczo found the Prius pinned against a tree, with three of the boys, Jacob, Drake, and Daniel, still inside in the back row of seats. The front passenger side of the vehicle and the passenger side of the vehicle sustained "the bulk of the damage." One of the boys still in the car did not appear to be breathing and was unresponsive; the other two were breathing but were similarly unresponsive. Officers Mogi and Biczo were not able to extract the boys from

3

the car and had to wait for fire department personnel to cut the roof of the vehicle open to remove them. One of the boys was pronounced dead at the scene and two were taken to the hospital, where they succumbed to their injuries.

The three other boys, J.I., S.C., and J.H., were able to extricate themselves from the crash and officers observed they bore injuries and were disheveled, panicked, confused, and disoriented. J.I. testified he saw the Infinity drive slowly past the crash site before driving away. J.H. testified to hearing Drake choking on his blood before he crawled over the center console and out the door J.I. opened. S.C. exited the vehicle from the driver's door and sat against the tree. One of the boys explained to Officer Mogi that the Prius was hit by a vehicle that left the scene.

California Highway Patrol dispatched Officer Guillermo Martinez and his partner to Chandra's home shortly after the accident. They observed a damaged white Infinity parked along the street in front of the residence, partially obscured by trash cans. The officers received no reply after knocking on Chandra's door multiple times and established a perimeter. Approximately three hours later, Chandra dialed 911, emerged from the home, and was ultimately arrested. During an interview with police, Chandra stated he drank a beer with his dinner.

An accident reconstruction expert, working for the California Highway Patrol, located a partial license plate frame, temporary paper license plate, and "Infinity" emblem near the Prius. The remainder of the license plate frame was embedded in Chandra's front bumper. The expert also identified an impression on the Prius back bumper as made by that license plate frame.

When questioned on the matter, the expert testified that the evidence did not indicate any pre-impact braking by the Prius. He also testified that

4

the data from the Infinity revealed that five seconds before the crash, the car traveled at 99 miles per hour. Two seconds before impact, the Infinity was traveling 94 miles per hour, at which point the driver began to softly depress the brake pedal. The expert opined that this was "not avoidance braking" or "even slowing" for traffic braking. The data revealed that the Infinity veered toward the right and then the left in the final second preceding impact. At the moment of impact, the Infinity traveled at 88 miles per hour, faster than the Prius, which traveled approximately 63 miles per hour.

B. *Chandra's Defense*

Chandra elected to take the stand as the sole defense witness. On the stand, he described drinking 12 beers on the night of the incident, a departure from his statement to police that he had consumed "a beer." He testified that he heard "pounding" on his front door, asserting it made him "alarmed" and "really, really[ ] afraid." He said the family was not expecting anyone that night, let alone a "man" in a hoodie with his pants pulled low, "doing some hand signals to someone" in a car in front of the house. When J.I. rang the doorbell, Chandra got "agitated" and concluded he was "probably someone . . . targeting [his] family." Chandra admitted J.I. was facing away from the home when he opened the door and asserted J.I. ran back to the car with his pants still down.

However, Chandra testified that his reaction to the prank was not just fear. He admitted to becoming "extremely, extremely mad," "like [his] blood was boiling." He described the ding dong ditch as "more of a pre-planned assault on a family to really sexually harass someone by dropping their pants." He believed the prank was "simply unacceptable," but did not dial 911. He described "a moral and legal and religious duty to stand up for [his] family and for [his] daughters."

5

Chandra admitted to getting into his car and following the boys. He stated that if he caught up to the car he "wanted to really express [his] anger" and tell them to never come back. He felt compelled to hold the prankster "accountable." Consistent with that testimony, he agreed that he felt "intense anger and rage" the entire time he was driving.

Despite his admitted rage, Chandra testified that he did not intentionally make contact with the Prius. He reported the Prius sideswiping his Infiniti before he got ahead of it and attempted to get it to stop. He attributed his ability to get in front of the Prius to his "more powerful" car. During cross-examination, he contradicted his earlier testimony and stated he moved in front of the Prius so he could pull over to "assess" after the supposed sideswiping. When his attempt to pull over or stop the Prius was unsuccessful, he began to "basically follow" the Prius so he could "get their license plate number." During his testimony, he described being too "enraged" to remember his cell phone when he left the house, but stated that he would have borrowed a stranger's cell phone to report the purported assault and the license plate number.

While he admitted to "driving fast," he described the Prius as "driving very, very fast" and asserted the Prius was swerving. He testified that the Prius suddenly "applied the brakes—[a] few seconds before the collision" while he followed behind it, and that the braking was to "throw [him] off the road." Chandra stated that, in response to the supposed "brake check," he "immediately tried to swerve in order to avoid the contact," but instead "had an unfortunate collision."

He saw the Prius against the tree in his rearview mirror, turned his car around to get a better look, and left. He explained that he did not stop at the scene because he "felt scared" and "didn't want to be blamed." He

6

nevertheless drove past the collision again before driving home. When he returned home, he testified that he parked the Infiniti on the street, behind the trash bins he asserts his wife put out for collection during his absence, went straight to his bedroom, calmed himself down, and "passed out." He did not call 911 at any point to report either the doorbell prank or the collision.

When he heard "loud banging" on his door at approximately 2:00 a.m., Chandra dialed 911, asserting he believed someone was there to hurt him. Dispatch informed him there were police officers outside his door, who ultimately arrested him.

Chandra continued to deny that he caused the collision that killed Jacob, Daniel, and Drake, instead blaming S.C., the driver of the Prius.

C. *The People's Rebuttal*

In rebuttal to Chandra's version of events, the People called Rodney Guetti and recalled two investigators. Guetti observed the wreck and attempted to offer assistance to the boys. When Guetti concluded he could not help extricate the boys from the car, he focused instead on finding the vehicle others described as being involved. He followed a trail of debris and fluid back to Chandra's house, where he observed Chandra emerge from the Infiniti. He inquired whether Chandra knew what he had just done, to which Chandra provided a mumbled response. After watching a woman put trash bins in front of the Infiniti and taking photographs, Guetti returned to the scene of the crash.

DISCUSSION

A. *Prosecutorial Conduct*

Chandra alleges a variety of prosecutorial actions amounted to reversible error. We disagree with his characterizations.

7

1. *Doyle*[2] Violation

Chandra alleges the prosecutor committed a *Doyle* violation. Specifically, he details three incidents he believes impermissibly referenced Chandra's postarrest silence: (1) inquiring whether an audio recording contained "the entirety of . . . the pertinent facts" from his interview with police, (2) inquiring whether he told investigators about the doorbell prank, and (3) impeaching Chandra's testimony that he consumed 12 beers on the night of the incident. The People argue any such error was forfeited and, further, that there was no *Doyle* error because the prosecutor only asked about Chandra's pre-*Miranda* invocation silence. The People have the better argument.

On the record before us, we conclude Chandra forfeited any alleged *Doyle* violation by failing to object below. However, because Chandra also challenges the efficacy of counsel around the failure to object, we consider the merits of his argument and conclude no *Doyle* violation occurred.

a. *Additional Factual Background*

During the People's cross-examination of Chandra, they introduced a 13-minute recording of his initial interview. At the start of that interview, investigators read Chandra his *Miranda*[3] rights and he acknowledged that he understood each of the rights included in the advisement. Chandra then continued answering questions from the police.

The exhibit ended before Chandra invoked his right to silence and the parties stipulated to its use.

---

2      *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).

3      *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

8

During his direct examination, Chandra testified that he consumed 12 beers on the night of the incident.  This contradicted a statement he made to police about having just one beer that night, memorialized in the originally omitted portion of the interview.  The court allowed the People to introduce a very limited section of the interview for impeachment purposes—the statement that he consumed *one* beer.

b. *Analysis*

"In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony." (*People v. Collins* (2010) 49 Cal.4th 175, 203.)  When a defendant is given a *Miranda* warning, he is informed that his silence, or refusal to answer questions posed by law enforcement, will not be used against him. (*People v. Lewis* (2004) 117 Cal.App.4th 246, 256.)  Given that representation, a prosecutor that later comments on the defendant's silence—or failure to answer questions or disclose exculpatory facts or evidence—after the defendant has been arrested and read a *Miranda* warning may violate the defendant's right to due process under the Fourteenth Amendment.  (*Doyle, supra*, 426 U.S. at pp. 619–620.)  Such errors are commonly referred to as *Doyle* errors, and a prosecutor can commit a prejudicial *Doyle* error by asking a single question that improperly refers to the defendant's silence.  (*Lewis, supra*, 117 Cal.App.4th at p. 256.)

However, if the defendant *waives* his *Miranda* rights and voluntarily speaks to law enforcement, the defendant has not chosen to remain silent. (Evid. Code, §§ 769, 770, 780, subd. (h), 1235; *Anderson v. Charles* (1980) 447 U.S. 404, 408.)  In such cases, anything the defendant *does* say, including any statements that are inconsistent with the defendant's testimony later at

9

trial, may be used to impeach the defendant's credibility. (*Anderson,* at p. 408; *People v. Hurd* (1998) 62 Cal.App.4th 1084, 1093–1094; *United States v. Hale* (1975) 422 U.S. 171, 176.)

Here, Chandra voluntarily continued speaking with police after they read him his *Miranda* rights—he did not initially elect to remain silent. Subsequently, Chandra testified at trial and the People impeached his credibility by pointing out that he did not tell the police of the doorbell prank during his voluntary statement, and by highlighting the inconsistent statements regarding how much alcohol he consumed. It is clear the purpose of the allegedly improper questions was not to imply that Chandra's invocation and eventual silence indicated his guilt, but rather to impeach his credibility by pointing out gaps and differences between his postarrest statement, offered immediately after the event, and his testimony at trial years later. (See *People v. Champion* (2005) 134 Cal.App.4th 1440, 1448, 1450–1451; *People v. Cartwright* (1980) 107 Cal.App.3d 402, 415 ["A defendant testifying on his own behalf at a criminal trial exposes himself to cross-examination and to explanation concerning his credibility and the reliability of his testimony."].)

Chandra's other challenge, to the question of whether the excerpt was "the entirety . . . of the pertinent facts that came out during [his] interview," similarly fails. Chandra affirmed the excerpt to be all the pertinent facts and, on his own accord, offered to the jury that "there were more conversations" and "more questions asked." However, neither the question nor the unresponsive answer Chandra offered informed the jury that Chandra exercised his right to remain silent; he effectively stated that there were additional questions and conversations that were not pertinent. The prosecutor confirmed those details on the record, asking, "Yes or no. Is the

10

entirety of the pertinent questions and answers regarding the incident on January 19, 2020, has that been presented to the jury in your interview?" Chandra replied that it was.

On this record, it is clear that the People did not impermissibly highlight Chandra's invocation or impeach him with his protected silence.

2. Other Conduct

Chandra also describes what he perceives to be prosecutorial misconduct, specifically asserting the People reduced their burden of proof, improperly stated the law regarding inconsistent statements, and impermissibly highlighted the fact that Chandra's family did not testify for his defense  These, he asserts, rise to the level of prosecutorial misconduct and merit reversal.  Chandra uses the term "misconduct" which " 'is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667 (*Centeno*).)

To preserve a claim of prosecutorial error for appeal, " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " (*People v. Clark* (2011) 52 Cal.4th 856, 960.)  "The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm." (*Ibid*.)  However, "[a] prosecutor's misstatements of law are generally curable by an admonition from the court." (*Centeno, supra*, 60 Cal.4th at p. 674.)

Although Chandra raises these issues now, he concedes he made no objections below.  Nothing in the record indicates an objection or request for an admonition would have been futile.  Chandra's claims of prosecutorial

11

error were therefore forfeited.  Even assuming he preserved the issues for appeal, the challenged statements do not constitute prosecutorial error.

First, Chandra alleges the prosecutor misstated the burden of proof. He argues that when the prosecutor described the beyond a reasonable doubt standard, he "undoubtedly misstated and lessened the prosecution's burden of proof."  In his closing argument, the prosecutor stated, "Many of you—probably all of you have some questions still because this is a human endeavor.  This is a real thing that really happened that we're looking for justice for.  This is not CSI.  There is always going to be questions in any human endeavor.  Questions don't mean it's not proven to you.  ¶ 'Beyond a reasonable doubt' very simply means you have an abiding conviction.  That just means when you ask yourself in your heart, What do I think happened? In your heart, you feel he's guilty and that feeling sticks with you.  It's an abiding conviction.  It's not, What happened?  Well, I think he's guilty. Maybe not.  That wouldn't be fair.  But beyond a reasonable doubt simply means that your confirmation, your belief abides with you.  It is a sustained belief.  That's what it means."

"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)  Although a showing of bad faith by the prosecutor is not required (*People v. Hill* (1998) 17 Cal.4th 800, 822), Chandra "must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the

12

prosecutor's statements.' " (*Centeno, supra*, 60 Cal.4th at p. 667.) If, when viewed in context, the prosecutor's challenged comments " 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130.) Applying these principles, we do not find the prosecutor's statements regarding proof beyond a reasonable doubt to be error.

Prior to closing arguments, the trial court instructed the jury and specifically advised: "You must follow the law as I explain it to you . . . . If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The trial court also explained: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." They were also twice instructed that, "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."

Contrary to Chandra's arguments on appeal, the prosecutor did not improperly attempt to diminish the People's burden of proof. Considering the statement and the instructions that jury received, there is no reasonable likelihood the jury would have understood the prosecutor's remarks to reduce the burden of proof or to contradict the unchallenged instruction they received. (See *Centeno, supra*, 60 Cal.4th at p. 667.)

Second, Chandra alleges that the prosecutor misstated the law regarding inconsistent statements. He specifically challenges the prosecutor's statement: "Not one witness in this case told you that they picked a house based on whether or not there was a pickup truck. You heard

13

about it a lot, but not one witness ever said that. Investigator Cuevas said that he believed [S.C.] said that, but then he reviewed [S.C.]'s transcript, and [S.C.] didn't say that. So I want to emphasize this. The evidence comes from what the witnesses say." He argues now that "[i]t was for the jury to determine whether to accept Officer Cuevas's testimony on this point about what he was told," citing to Evidence Code section 1235 and CALCRIM No. 318.

The jury received CALCRIM No. 318, advising them: "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements" in listed, permissible ways. Again, Chandra concedes his counsel did not object to the prosecutor's statement or request any curative instruction. The prosecutor's argument did not misstate the law; instead, the prosecutor clarified what constitutes evidence and summarized what Officer Cuevas's testimony consisted of. Further, the prosecutor's summary did not contradict the instruction the jury received on that point from the court.

Finally, Chandra alleges the prosecutor misled the jury when he questioned why Chandra did not call logical witnesses, asserting the People told the jury they were barred from calling his spouse or children. We note that he does not quarrel with the People's right to comment on his failure to call logical witnesses, but rather with the prosecutor's explanation for why the People did not call his family themselves. During his closing argument, the prosecutor stated: "Look. It's our burden to prove this case, every element of it, and we embrace that burden. But both sides get to call witnesses. You can ask yourself which witnesses were called and which ones weren't? That's a logical question. If Mr. Chandra was in his house drinking all day or all night, it would be logical to expect [his wife or children] to

14

testify." Later, he returned to the topic, asking: "Where is [his wife]; right? Where is she? I don't know. I don't know. You should all be asking yourself that question." After questioning why Chandra did not call those logical witnesses, he explained why the People did not: "There are rules of evidence, like marital privilege, spousal privilege, spousal communications. And not to mention that [his wife] has a Fifth Amendment right as well, just like Mr. Chandra. Because if she did anything to obstruct justice in this case, or to be an accessory after the fact, like moving that trash bin, or who knows what else, she would have a Fifth Amendment privilege not to testify."

Chandra complains that the privileges his wife held were not impediments to the People calling his family to testify and that the prosecutor failed to make that clear. Specifically, he argues that because he and his wife were legally separated, they were neither spouses nor married people as contemplated by the law. He alleges that his wife could have testified to his actions or to communications made within earshot of their children that could not be confidential. Finally, he asserts the People could have resolved the issue of his wife's Fifth Amendment rights by offering her immunity. Taken together, he argues the prosecutor inaccurately represented that he had no means by which to secure her testimony. He also highlights that his children were not shielded by the same privileges enjoyed by his wife.

"California recognizes two marital privileges. First a spouse may refuse to testify against the other spouse (spousal testimony privilege.) (Evid. Code, § 970.) Second, a spouse may refuse to disclose or may prevent the other spouse from disclosing confidential communications between them during their marriage (marital communications privilege). (Evid. Code, § 980.)" (*People v. Sinohui* (2002) 28 Cal.4th 205, 208.)

It is an inescapable fact that Chandra and his wife were legally married at the time of trial. The marital privilege codified in Evidence Code section 970 survives "until the marriage is dissolved by a final judgment of dissolution even though the marriage became nonviable years before. ([Citation].) The privilege is not available after the marital relationship is terminated *by divorce.*" (*People v. Barefield* (2021) 68 Cal.App.5th 890, 901, italics added.) We must conclude, therefore, that Chandra's wife still enjoyed spousal testimony privilege at the time of trial.

Similarly, there is nothing on the record before us to suggest that section 980 of the Evidence Code, regarding the marital communications privilege, would not apply. Section 980 of the Evidence Code states: "Subject to Section 912 and except as otherwise provided in this article, a spouse . . . , whether or not a party, has a privilege during the marital or domestic partnership relationship *and afterwards* to refuse to disclose, and to prevent another from disclosing, a communication if he or she claims the privilege and the communication was made in confidence between him or her and the other spouse while they were spouses." (Italics added.) It is clear, then, that the prosecutor did not err by observing that Chandra's wife held privilege that could prevent her from testifying against him.

We turn to the matter of the Fifth Amendment. Chandra asserts that the People could have offered Chandra's wife immunity in order to compel her testimony over any claims of privilege. He relies on this possibility to argue that the People misstated the facts and misrepresented whether they had any means by which to secure his wife's testimony. The prosecutor did not state that he had *no means* by which to secure her testimony. Instead, he observed "she has a Fifth Amendment right as well, just like Mr. Chandra." Chandra advances no law or facts that suggests his wife *did not* have a Fifth

16

Amendment right against self-incrimination at the time of trial, or that otherwise undermine the veracity of the prosecutor's statement.

Chandra briefly argues that he "was not married to his daughters" at the time of trial, so it was error for the prosecutor to "conflate [his] wife and her issues with the question of [his] daughters." The jury received instruction on using the ordinary meanings of words. No reasonable juror would extrapolate that the "marital privilege, spousal privilege, [and] spousal communications" referred to Chandra's daughters. The People's argument was narrow—calling into question why Chandra did not call his wife to testify and delving into specific concerns around *her* Fifth Amendment right against self-incrimination. Regarding Chandra's children, the prosecutor reminded the jury only that they "[we]re uncooperative" and "wouldn't talk to law enforcement."

In total, we conclude the prosecutor did not commit prosecutorial error by highlighting the logical witnesses that Chandra could have called, or by truthfully explaining the privileges some of them may have held and why the People did not call them to testify.

B. *Ineffective Assistance of Counsel*

" ' "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) 'Construed in lights of its purpose, the right entitles the defendant not to some bare assistances but rather to *effective* assistance.' ([Citation], italics in original.) In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' " ' " (*In re Richardson* (2011) 196 Cal.App.4th 647, 657.)

17

" 'We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 261.) "A claim of ineffective assistance of counsel based on a trial attorney's failure to make a motion or objection must demonstrate not only the absence of a tactical reason for the omission [citation], *but also that the motion or objection would have been meritorious* if the defendant is to bear his burden of demonstrating that it is reasonably probable that absent the omission a determination more favorable to defendant would have resulted." (*People v. Mattson* (1990) 50 Cal.3d 826, 876, italics added.)

We note that " 'deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 985.) Counsel may, in the exercise of their professional judgment, determine that an objection would not result in a more favorable determination for their client. (*Strickland v. Washington* (1984) 466 U.S. 668, 690; accord, *People v. Barrett* (2012) 54 Cal.4th 1081, 1105.)

The People did not commit a *Doyle* violation by impermissibly impeaching Chandra with his post-*Miranda* silence. Similarly, the prosecutors did not commit error meriting challenge. We therefore conclude Chandra has not met his burden of showing ineffective assistance of counsel. His counsel could have reasonably determined, under established laws, that objections at the time of trial would be unmeritorious.

C. *Evidentiary Decisions*

1. Chandra's Statement

Chandra challenges the admission of his statements to investigators, discussed briefly above with respect to *Doyle* errors. He asserts he was

deceived and participated in the interview against his will because the officer asked biographical questions before transitioning to inquiring about the incident. Chandra's argument regarding deception is structured exclusively around the officer building rapport with him. He argues that because the statements were obtained through deception, they were obtained in violation of *Miranda*.

a. *Additional Factual Background*

At the start of his interview, Officer Cuevas first asked for Chandra's name and birthdate. After getting those details, Officer Cuevas explained:

"[CUEVAS]: So I'm, uh, I'm—I'm investigating a traffic collision that happened today. Okay? I talked to a lot of different witnesses. Um, I got a pretty big picture[ ] of what happened. Um, there is—There's two sides to every story. Uh, I am looking to find out exactly what happened. Um, you're a big piece to the puzzle. Your information is important to this investigation and what you have to offer. Um, other people have been willing to help us out by telling us what they know and we got witnesses. Uh, we got the people that were driving another vehicle. Um, but I want you to help out as well.

"[CHANDRA]: Yes, Sir.

"[CUEVAS]: Okay? Um, before we start, I wanna read you something. Uh, okay so you know as you are in handcuffs and you are here at my station, I have to read you your Miranda Rights. Uh, you have the right to remain silent. Do you understand that?

"[CHANDRA]: Yes, Sir.

"[CUEVAS]: Anything you say may be used against you in court. Do you understand that? Is that a yes?

"[CHANDRA]: Yes, Sir.

"[CUEVAS]: You have the right to the presence of an attorney before and during any questioning. Do you understand?

19

"[CHANDRA]:  Uh, yes, Sir.

"[CUEVAS:]  If you cannot afford an attorney, one will be appointed free of charge before any questions if you want.  Do you understand?

"[CHANDRA]:  Yes."

Officer Cuevas then asked for Chandra's address and additional background information before discussing the night of the incident.  The admitted portion of the interview were the first 13 minutes.

### b. *Analysis*

A defendant's statements to police during a custodial interrogation are inadmissible to establish his guilt unless the defendant knowingly and intelligently waived the right to remain silent and to the presence and assistance of counsel.  (*Miranda, supra*, 384 U.S. at p. 475.)  An interrogation must end if the suspect indicates the desire to remain silent or to consult an attorney, and any statements contained thereafter may not be admitted against the accused during trial.  (*Fare v. Michael C.* (1979) 442 U.S. 707, 709.)  "[A] suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement need not do so with any particular words or phrases.  A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision."  (*People v. Cruz* (2008) 44 Cal.4th 636, 667 (*Cruz*).)  "A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights."  (*Ibid.*)  " 'In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and

intelligently waived them.' [Citations.]" (*People v. Parker* (2017) 2 Cal.5th 1184, 1216 (*Parker*).)

After Chandra was properly admonished of his *Miranda* rights, he elected to continue speaking with police. He did not indicate a desire to remain silent or speak with an attorney. Although his waiver was not of some "predetermined form," it was nevertheless a waiver. (*Cruz, supra*, 44 Cal.4th at p. 667.) That is, he expressed a "willingness to answer questions after acknowledging an understanding of his . . . *Miranda* rights." (*Ibid.*) He heard a full recitation of his rights, acknowledged understanding them and made an " 'uncompelled and uncoerced decision to talk.' " (*Parker, supra*, 2 Cal.5th at p. 1216.) We must therefore conclude he " 'knowingly, voluntarily, and intelligently waived' " his *Miranda* rights. (*Ibid.*)

We are unpersuaded by Chandra's claim that Officer Cuevas used "psychological ploys . . . so coercive that the[y] tend[ed] to produce a statement that is involuntary." He contends that Officer Cuevas used "deception . . . through the implied benefit of faster processing, access to consular officials in [India], and, if needed, medical treatment." Further, he attacks questions Officer Cuevas asked about Chandra's children, alleging they were coercive because Chandra "would have an interest in answering [questions] to ensure that they were looked after if he were to remain in custody." However, he cites no authority to support his contention that transitioning from biographical questions to questions about a fatal car crash constitutes deception. We nevertheless evaluate whether Chandra's implied waiver of his *Miranda* rights was voluntary.

"The test for the voluntariness of a custodial statement is whether the statement is ' "the product of an essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for

21

self-determination critically impaired" ' by coercion." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642.) "Relevant considerations include ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*Id.* at pp. 642–643.)

The record here establishes that Chandra's will was not overborne and his statements were not coerced. It is undoubtedly true that Officer Cuevas sought to establish a rapport with Chandra, asking background questions before transitioning into inquiries regarding the incident. However, building rapport is not impermissible. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1081, 1086–1087; *People v. Williams* (2010) 49 Cal.4th 405, 447.) In contradiction to Chandra's argument on appeal, Officer Cuevas never discussed faster processing or consular officials during the 13-minute interview. Indeed, he clarifies: "I'm not going to badger you. I'm not gonna mistreat you, okay?" During the short interview, Officer Cuevas established that Chandra earned his master's degree at a university in England, inferring he was comfortable proceeding in English. He inquired into whether Chandra was physically well or on any substances. In short, Officer Cuevas addressed the considerations relevant to whether Chandra's *Miranda* waiver was voluntary before turning to the topic of the crash.

Because Chandra impliedly waived his *Miranda* rights and did so freely, we conclude the trial court did not err in admitting the statements Chandra made to police.

2. Excluded Evidence

Chandra challenges the court's refusal to admit evidence that the boys were contributorily negligent. He focuses his argument on the court's

22

decision to prohibit him from soliciting additional testimony regarding seatbelt usage and the maximum weight capacity of the Prius.  The court prevented defense counsel from exploring the details of a theory of contributory negligence.  He contends that trial court's constraints denied him the ability to cross-examine the People's witnesses and, thus, denied him his right to due process.

Only relevant evidence—evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210)—is admissible at trial.  (*Id.*, § 250.)  Even if relevant, the court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*, § 352.)  We review Evidence Code section 352 decisions for abuse of discretion.  (*People v. Lee* (2011) 51 Cal.4th 620, 643.)

"As a general matter, the ordinary rules of evidence"—including Evidence Code section 352—"do not impermissibly infringe on the accused's right to present a defense."  (*People v. Hall* (1986) 41 Cal.3d 826, 834.)  "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

As relevant here, contributory actions do not absolve a defendant of responsibility for murder.  (See *People v. Caldwell* (1984) 36 Cal.3d 210, 219–221.)  A defendant "cannot obtain exoneration by claiming the victim should have reacted differently or more prudently."  (*People v. Armitage*  (1987) 194 Cal.App.3d 405, 421.)  In *People v. Marlin* (2004) 124 Cal.App.4th 559,

570, a defendant, who collided with another car while driving under the influence of alcohol, was criminally liable for the victim's injuries despite the potential that she might have been drinking as well. Indeed, our colleagues in the Third District explicitly rejected the defendant's premise "that he was not guilty of a crime because [his victim] might have avoided the accident." (*Id.* at p. 569.) Such contributory negligence relieves an accused of liability only when it was the "sole or superseding" cause of death. (*People v. Autry* (1995) 37 Cal.App.4th 351, 360.) Chandra does not contend that either the lack of seatbelts for every occupant or the total weight of the Prius was the sole and superseding cause of death.

Here, we see no abuse of discretion or constitutional violation. The fact that the Prius had only five seatbelts while it carried six occupants was already before the jury. Similarly, the jury heard that the "gross vehicle weight rating" for the Prius was 3,615 pounds and the total estimated weight on the night of the fatal crash was 3,612 pounds. Testimony beyond those facts, elicited on cross examination to develop the theory of contributory negligence, would serve only to confuse the issues or mislead the jury. Such testimony could serve only to imply to the jury that being unrestrained in the vehicle, or being at or exceeding the total gross vehicle weight rating, somehow superseded Chandra ramming the car as the cause of death for three boys.

The seatbelt and weight issues are severable from Chandra's contentions regarding causation. Chandra maintained that S.C.'s driving caused the fatal collision. However, neither unrestrained passengers nor total weight go to the issue of whether brake checking caused the accident. We therefore conclude the court did not abuse its discretion in excluding additional evidence about the use of seatbelts and weight of the Prius.

24

D. *Jury Instructions*

Chandra also alleges the jury was improperly instructed and, as a result of these supposed errors, his right to due process was abridged.

On review, we determine independently whether substantial evidence supported a requested jury instruction. (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055.)

1. Kill Zone

The prosecution requested the jury receive the "kill zone" instruction,[4] which Chandra contended and now maintains was not required on the facts of this case. He argues that the instruction was inappropriate because he did not know how many people were in the Prius and therefore could not maintain a specific intent to kill them.

An instruction on the kill zone theory is warranted "if there was substantial evidence in the record that, if believed by the jury, would support a reasonable inference that defendants intended to kill everyone within the 'kill zone.'" (*People v. Canizales* (2019) 7 Cal.5th 591, 609–610 (*Canizales*).) As applied here, there must be: (1) evidence regarding the circumstances of Chandra's (attack) on J.I. "that would support a reasonable inference" that he intentionally created a zone of fatal harm around J.I., and (2) evidence that

---

[4] The relevant portion of the instruction read: "A person may intend to kill a primary target and also secondary targets within a zone of fatal harm or 'kill zone.' A 'kill zone' is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target. In order to convict the defendant of the attempted murder of [S.C.] and [J.H.], the People must prove that the defendant not only intended to kill [J.I.], but also either intended to kill [S.C.] and [J.H.], or intended to kill everyone within the kill zone. ¶ In determining whether the defendant intended to kill [S.C.] and [J.H.], the People must prove that (1) the only reasonable conclusion from the defendant's use of reasonable force, is that the defendant intended to create a kill zone; and (2) [S.C.] and [J.H.] were located within the kill zone."

25

the other boys were "located within that zone of fatal harm." (*Id.* at p. 610.) Such evidence, taken together, would permit a finding that Chandra harbored the requisite intent to kill the five other boys "because [they were] within the zone of fatal harm." (*Ibid.*)

We are unpersuaded by Chandra's argument that the instruction was inappropriate because he did not know how many people were in the Prius; it is not necessary that Chandra knew the precise number of people in the kill zone. (See e.g., *People v. Stone* (2009) 46 Cal.4th 131, 140 [a person placing a bomb on an airplane with the intent to kill any passengers would be guilty of the kill zone attempted murder of everyone on that plane, notwithstanding the person's ignorance of who was on the manifest or how many individuals would board that plane].) The fact that Chandra did not or could not see all of his victims "did not somehow negate [his] express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." (*People v. Vang* (2001) 87 Cal.App.4th 554, 564.) The focus remains, instead, on Chandra's intent to create a zone of fatal harm around J.I.

Chandra described his anger toward J.I. and his desire to follow him and hold him "accountable" for the prank. He watched J.I. make hand motions at someone in the car before J.I. returned to the passenger side of the Prius. He also repeatedly described trying to find and stop "them" and determine where "they" had gone, even though he identified the doorbell ringer as a single male. Chandra also described angrily following the Prius, the power superiority his car held over the Prius, and connecting with the back of the Prius while he was driving more than double the posted speed limit. He admitted that the Prius subsequently left the roadway and collided with a tree. That testimony supports an inference that Chandra targeted J.I.

*and* that Chandra knew there was at least one other occupant of the vehicle beyond his target. Therefore, substantial evidence supports giving a kill zone instruction because the evidence would permit a finding that Chandra intended to create a zone of fatal harm around J.I. as the primary target in retaliation for what he described as preplanned assault—mooning him. (See *Canizales, supra*, 7 Cal.5th at p. 610.)

>    2. CALCRIM No. 371

Chandra next quarrels with the court's decision to instruct the jury regarding consciousness of guilt using CALCRIM No. 371.[5] He contends the instruction was erroneously given because the People did not separately present evidence that Chandra prevented anyone from testifying against him. At trial, he objected only because "it requires a showing that [Chandra] suppressed or fabricated evidence." Now, his argument focuses exclusively on the portion of the instruction regarding discouraging a witness from testifying, specifically his wife and daughters.

We conclude the instruction was appropriate because sufficient evidence supported it. "A trial court properly gives consciousness of guilt instructions where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions." (*People v. Alexander* (2010) 49 Cal.4th 846, 921.) The facts

---

[5] CALCRIM No. 371, as given, reads: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. ¶ If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

giving rise to an inference of consciousness of guilt need not be conclusively established before the instruction may be given; there need only be some evidence in the record that would sufficiently support the suggested inference. (*Ibid.*)

Chandra placed his wife in the critical moments of the night at issue. He testified that there were loud repeated bangs on their door that scared *her*. He implied *she* could confirm that he drank a case of beers prior to the ding dong ditch. Chandra testified that *his wife* put the trash bins out as part of the usual waste collection schedule and that he parked his damaged car behind them. A rebuttal witness described a woman pulling the trash cans in front of Chandra's mangled car in the minutes after the accident—not that he pulled up behind them as he implied. While Chandra was in custody, he called his wife to explain what they reportedly witnessed together—to confirm with her what they experienced and what he told police.

Together, this evidence supported the instruction given, even as to discouraging witnesses from testifying. That is, a reasonable juror could infer that Chandra provided a version of the night's events that he wished his wife to go along with—requiring she perjure herself—or, in the alternative, that he was instructing her to not testify and contradict him. Accordingly, we conclude the court did not err by instructing the jury using CALCRIM No. 371. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1236.)

### 3. Pinpoint Instruction

The final error Chandra alleges regarding jury instruction involves the court's decision to deny the pinpoint instruction he requested.[6] The proposed instruction incorrectly stated that if the jury did not believe Chandra intentionally hit the Prius, they must acquit him of all charges.

When a pinpoint instruction incorrectly states the law, denying the instruction is not error. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 53.)

Chandra was charged with three counts of first degree murder and three counts of attempted murder. Second degree murder is a lesser included offense of first degree murder. (*People v. Cooper* (1991) 53 Cal.3d 771, 827.) Consistent with theories of second degree murder, the jury received instruction on express malice and implied malice murder. As the People argue in their briefs, even if Chandra's contentions about sideswiping and brake checking were true and he did not intend to strike the Prius, he could still be convicted under an implied malice theory of second degree murder. That is, a reasonable fact finder could determine he intentionally and deliberately drove more than 90 miles per hour in a 40-mile per hour zone, chased down a car he concedes was much less powerful and followed closely

---

[6] The proposed pinpoint instruction read: "The People allege that the defendant intentionally—and by that I mean on purpose—struck the Toyota Prius with his car. ¶ To find the defendant guilty of any of the crimes he is charged with, or any lesser included offenses he is charged with, you must find, beyond a reasonable doubt, that the defendant struck the Toyota Prius with his car intentionally, that is, on purpose. ¶ If you believe that the defendant struck the Toyota Prius by accident, or by mistake, or by ordinary negligence of carelessness, or if you have any reasonable doubt as to whether the defendant struck the Toyota Prius with his car intentionally, that is on purpose, the defendant is not guilty of all of the crimes he is charged with, including all lesser offenses, and, accordingly, you must find the defendant not guilty."

behind it due to his reported rage.  A reasonable jury could further conclude he knew the natural and probable consequences of that act were dangerous to human life.  It follows that because Chandra could still be convicted on a theory of implied malice second degree murder, the pinpoint instruction he offered was an incorrect statement of the law and the trial court properly denied it.

E.  *Cumulative Error*

Finally, having found no error, we do not consider Chandra's claims of cumulative error.  (See *People v. Martinez* (2003) 31 Cal.4th 673, 704.)

DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DO, J.


KELETY, J.

30